## UNITED STATES v. DAVIS.

### (Circuit Court of Appeals, Eighth Circuit. January 27, 1893.)

### No. 160.

1. CUSTOMS DUTIES—CLASSIFICATION—MARBLE MOSAICS.
    Pieces of marble less than an inch in length and breadth, and pasted on paper in the form of blocks, or loose in bags, and intended to be imbedded in cement, so as to form a mosaic pavement, are dutiable at $1.10 per cubic foot, as marble paving tiles, under paragraph 124 of the tariff act of October 1, 1890, (26 St. at Large, p. 567,) and not at 50 per cent. ad valorem, as manufactures of marble not specially provided for, under paragraph 125. Davis v. Seeberger, 44 Fed. Rep. 260, approved.

2. SAME—CONSTRUCTION OF STATUTE.
    In cases of doubt as to the classification of an imported article, the construction most favorable to the importer should be adopted. Hartranft v. Wiegmann, 7 Sup. Ct. Rep. 1240, 121 U. S. 609, followed.

3. SAME.
    Where a duty is imposed upon an article by a specific name, this will determine its classification, although the article may be included in other words of general description in another part of the same act. Twine Co. v. Worthington, 12 Sup. Ct. Rep. 55, 141 U. S. 468, followed.

4. SAME—REVIEW OF APPRAISERS' DECISION—FORM OF JUDGMENT AGAINST THE UNITED STATES.
    In a proceeding under Act June 10, 1890, § 15, to review the decision of the board of general appraisers, the award of the circuit court is not limited to giving a mere certificate showing the amount due the claimant, but its duty is to hear, decide, and adjudge, under Act March 3, 1887, (24 St. at Large, p. 505,) and a judgment "that the petitioner recover" is not erroneous.

5. SAME—COSTS AGAINST THE UNITED STATES.
    In a proceeding to review a decision of the board of general appraisers, under Act June 10, 1890, § 15, costs are recoverable against the United States, since the purpose of the act was merely to "simplify the laws" and change the procedure, not to take away the previously existing right of the importer to costs, (in his action against the collector;) and, where the

United States are appellants, and decision is against them, the costs should be paid out of the proper fund according to Rev. St. § 1001. U. S. v. Barker, 2 Wheat. 395, distinguished.

Appeal from the Circuit Court of the United States for the Eastern District of Missouri.

Proceeding by Frank L. Davis to review a decision by the board of general appraisers affirming the decision of the surveyor of customs at St. Louis in assessing duties on marble mosaics for pavements. The circuit court reversed the decision. The United States appeal. Affirmed.

Statement by SHIRAS, District Judge:

On the 13th of December, 1890, Frank L. Davis, the appellee, entered at the port of St. Louis 10 cases containing pieces of marble from three eighths to seven eighths of an inch in length and breadth, and pasted on paper, forming blocks about 12 by 24 inches, and 1 case containing the same kind of pieces of marble, not attached to paper, but loose in bags; and on the 18th of December, 1890, the appellee entered a further importation of 22 cases, containing like pieces of marble, all of which were attached to paper. The surveyor of customs at St. Louis assessed these importations as manufactures of marble, and therefore dutiable, under the act of congress approved October 1, 1890, at the rate of 50 per cent. ad valorem. The duty thus assessed was paid by the importer under protest, it being claimed that the articles were marble paving tiles, and therefore subject to the duty of $1.10 per cubic foot, and appeals from the ruling of the surveyor of customs were duly prosecuted to the board of general appraisers at the city of New York under the provisions of section 14 of the act of congress approved June 10, 1890, (26 St. at Large, p. 131.) The board of appraisers affirmed the decision of the surveyor of the port of entry, holding that the imported articles were manufactures of marble, and thereupon the importer applied to the circuit court of the United States for the eastern district of Missouri for a review of the questions of law and fact involved in the matter in controversy according to the provisions of section 15 of said act of June 10, 1890, and upon the hearing thus had before the circuit court it was adjudged that the articles imported were dutiable as marble paving tiles, and that the importer was entitled to judgment for the excessive duties collected of him, amounting to the sum of $521.33. From this decision and judgment the United States appealed to this court, and thus the question is presented whether the imported articles should be deemed to be manufactures of marble or marble paving tiles in classifying the same for assessment under the provisions of the act of congress of October 1, 1890.

George D. Reynolds, U. S. Atty.

Clinton Rowell and Franklin Ferriss, for appellees.

Before CALDWELL and SANBORN, Circuit Judges, and SHIRAS, District Judge.

SHIRAS, District Judge, (after stating the facts.) The act of congress approved October 1, 1890, (26 St. at Large, pp. 567–573,) assesses duties on marble under three heads, to wit: Paragraph 123: "Marble of all kinds, in blocks, rough or squared, sixty-five cents per cubic foot." Paragraph 124: "Veined marble, sawed, dressed, or otherwise, including marble slabs and marble paving tiles, one dollar and ten cents per cubic foot, (but in measurement no slab shall be computed at less than 1 inch in thickness.)" Paragraph 125: "Manufactures of marble, not specially provided for in this act, fifty per cent. ad valorem."

On behalf of the United States it is contended (1) that the importations in question are shown not to come under the specific designation of "marble paving tiles;" (2) that they come under the designation of "manufactures of marble," and therefore the classification made by the surveyor of customs was correct.

In construing the various provisions of the acts of congress imposing duties upon importations, in cases of doubt the construction most favorable to the importer must be adopted. U. S. v. Isham, 17 Wall. 496; Hartranft v. Wiegmann, 121 U. S. 609, 7 Sup. Ct. Rep. 1240.

When a duty is imposed upon an article by a specific name, such designation will determine its classification, although there may be in the same act of congress other words of general description which would include the article in question. Homer v. The Collector, 1 Wall. 486; Arthur v. Lahey, 96 U. S. 112; Twine Co. v. Worthington, 141 U. S. 468, 12 Sup. Ct. Rep. 55.

Under these rules of construction, as well as under the express language of the paragraph itself, nothing can be included under the terms of paragraph 125, to wit, "Manufactures of marble, not specially provided for in this act," which come fairly within any one of the several classifications contained in paragraphs 123 and 124. In the latter are found the words "marble paving tiles," which are clearly intended to create or define a class which includes tiles of marble to be used for paving purposes; and therefore all articles, whether manufactured or not, which come within this particular description by reason of the material of which they are composed and the use for which they are designed, must be so classed, regardless of the minor differences which may serve to distinguish one kind of marble paving tile from another.

In the testimony of some of the witnesses on behalf of the government the meaning of the word "tile" is sought to be restricted to the one kind of tile that is made from burned earth or clay, but such limited use of the word is not admissible in the present case. Derivatively, the word means a covering, and hence is applied to such articles as are used for covering roofs, pavements, walls, and the like. The original meaning of the word refers, therefore, to the use made of the article, and not to the material of which it may be composed. In the Encyclopedia Britannica, under the article "Roofing Tiles," it is said, "In the most important temples of ancient Greece the roof was covered with tiles of white marble, fitted together in the most perfect way, so as to exclude rain;" and in a note to this article it is further stated that "marble tiles are said to have been first made by Byzes, of Naxos, about 620 B. C." In Jules Adeline's Art Dictionary, a work of recognized merit, it is stated that "Roman temples were sometimes covered with bronze tiles, laid side by side, while the roofs of Chinese temples generally consist of tiles of crane porcelain, painted green or yellow. The term 'tile' is also applied to plaques of marble, stone, or earthenware, sometimes decorated, sometimes with a uniform surface, which are used to cover walls or pavements. As a rule, they are either square or rectangular. Sometimes, however,

they are triangular, or in shape of a lozenge, hexagon, or octagon. They are then capable of very varied combinations." Among the definitions of the word "tile" in the Century Dictionary is the following: "Also a slab of stone or marble, used with others like it in a pavement or revetment. In the middle ages such tiles of stone were frequently incised with elaborate designs, the incisions being filled with lead or a colored composition, or occasionally incrusted in mosaic."

In Rossman v. Hedden, 145 U. S. 561,--568, 12 Sup. Ct. Rep. 925, it is said by the supreme court that "the covering of roofs, floors, and walls with tiles made of many different materials is of very ancient origin, and there is much interesting information in respect of their manufacture and that of pottery to be found in works on those subjects." It thus appears that the word "tile," etymologically considered, is not limited to an article of one material only. On the other hand, we well know that by the usages of trade and commerce words may come to have a signification or meaning much less comprehensive than that originally pertaining to them and it is entirely possible that the word "tile," unaccompanied with qualifying words, might be limited to articles made of baked earth or clay. Thus in Rossman v. Hedden, supra, it is said: "So far as this case is concerned, we see no reason to question the sufficiency of the ordinary definition of tiles as plates or pieces of baked clay, used for covering roofs, floors, and walls, and for ornamental work of various kinds, as well as for drains," etc.

In the case just cited the supreme court was called upon to construe the provisions of the tariff act of March 3, 1883, (22 St. at Large, p. 488,) it being therein held that plain glazed and plain enameled tiles were properly classified under the fourth paragraph of Schedule B as earthenware not otherwise specially enumerated, for the reason that it appeared from the evidence that when the act of March 3, 1883, was enacted, in commercial usage paving tiles did not include glazed or enameled ware, but only hard, unglazed tiles, fitted to endure the wear to which a pavement is ordinarily subjected. It was doubtless in view of this limited meaning that had become attached in commercial usage to these words that congress in the act of October 1, 1890, in framing Schedule B, included therein paragraph 94, which reads as follows: "Tiles and brick, other than firebrick, not glazed, ornamented, painted, enameled, vitrified, or decorated, twenty-five per centum ad valorem; ornamented, glazed, painted, enameled, vitrified, or decorated, and all encaustic, forty-five per centum ad valorem."

Many articles which, under the act of 1883, would have been classed as earthenware, would, under the act of 1890, be classed as tiles; the rate of duty being determined by the question whether they were glazed, enameled, painted, decorated, or not. To guard against the limitation of the word "tile" when applied to an article intended to be used for paving purposes to that kind of tile made from burnt earth or clay, the words "marble paving tile" were inserted in paragraph 124. Tiles intended for paving purposes, made from burnt earth or clay, are covered by the provisions of paragraph

94, and tiles intended for paving purposes, made out of marble, are included within the provisions of paragraph 124. Articles of importation which, by reason of the material of which they are composed and the use to which they are to be put, are fairly described by the phrase "marble paving tiles," must be so classed, even though there may be other general classifications in the act of congress which might include them. As we have seen from the authorities already cited, a paving tile, within the meaning of the act of congress of 1890, is a piece of burned earth or clay or of marble, suitable for and intended to be used as a covering for a floor, a pavement, or the like.

It is not questioned in this case that the articles imported were intended to be, and were in fact, used in covering floors and pavements, the manner of imbedding the same in cement not being substantially different from that used where the pieces of marble are of larger size; but it is claimed that the pieces of marble constituting the covering of the pavement should not be deemed to be paving tiles of marble, because they are smaller than the pieces which in former years were used for paving purposes, and because, by reason of their smaller size, they can be laid so as to form artistic designs or patterns, thus making a mosaic pavement. From the evidence in the case it appears that formerly marble floors or pavements were made of pieces of marble of several inches in length and width, but latterly they are largely constructed of pieces less than an inch in size. It is said that experience has shown that floors made of the larger pieces are more liable to crack, and are not as durable, as those made of the smaller pieces; but, whatever may be the cause or causes for the change in the size of the pieces used, the lessening of the size does not change the character of the floor or pavement made therefrom; whether composed of pieces of marble six inches or an inch square, in either case, it is a floor or pavement made of marble paving tile, for in defining paving tile, whether of earth, clay, or marble, the act of congress does not make the size thereof an element in the definition of the article. Some of the witnesses for the government state that pieces of marble of the size of those now under consideration are known in the trade as "mosaics" or "marble mosaics." It is entirely possible that, for the purpose of distinguishing the different sizes of the article, the word "mosaic" is used to define the sizes which are readily adapted to be laid in the form of designs, thus giving an artistic appearance and finish to the floor or pavement; but no matter how variegated in color or intricate in pattern or artistic in effect may be the pavement constructed, as compared with one made from larger pieces of a single color, it is equally true of both pavements that they are made of pieces of marble suitable for paving purposes, and are therefore both constructed of marble paving tile.

In the case of Davis v. Seeberger, 44 Fed. Rep. 260, the question was presented of the proper classification of similar pieces of marble under the provisions of the tariff act of March 3, 1883, (22 St. at Large, p. 488.) The collector claimed, as in this case, that they were dutiable as a manufacture of marble, not otherwise enumer-

ated, but Judge Blodgett held that they were not a manufacture of marble, but came under the designation of marble paving tiles. The reasoning in that case is entirely applicable to the question now before this court, and fully sustains the conclusion we have reached, that the articles composing the importations made by the appellee are included in the words "marble paving tile," as the same are used in the act of 1890.

Much stress is laid in the argument of counsel for the government upon the difficulty of ascertaining the cubic contents of small pieces of marble such as form the importations in question, so as to ascertain the amount of duty at the rate of $1.10 per cubic foot. It is not made to appear that there was any difficulty in ascertaining the difference between the amount of the duty at 50 per cent. ad valorem, and at $1.10 per cubic foot, as it is not questioned in the record that the difference between the two amounts is $521.33, for which judgment was rendered in the trial court; and the evidence does not conclusively show that methods for ascertaining the number of cubic feet contained in importations of this kind cannot be devised which will be sufficiently accurate for all practical purposes. Even if there was difficulty in this particular, it would not justify the court in taking the imported articles out of the class to which they clearly belong and assigning them to another, upon which a higher duty is imposed, for the citizen cannot be thus subjected to a heavier burden, which is not clearly within the intent of the statute. The conclusion reached by the trial court that the articles in question were subject to duty as marble paving tiles was correct, and is therefore affirmed.

Exception is also taken to the form of the judgment entered by the circuit court, which is as follows, omitting the formal and preliminary recitals: "It is therefore considered by the court that the petitioner, Frank L. Davis, have and recover of the United States the sum of five hundred and twenty-one dollars and thirty-three cents damages, aforesaid, by the court assessed, and also costs in this behalf expended, and that a copy of this judgment be certified to the attorney general of the United States, according to law." On behalf of the United States it is claimed that the entry should have been merely in the form of a certificate showing the amount found due the claimant.

Before the enactment of the statutes conferring on the court of claims and the circuit and district courts jurisdiction over certain classes of cases against the United States, it was doubtless true that no judgment for the recovery of money could be rendered against the government. The right to enter judgment did not exist, because the courts did not have jurisdiction to hear and decide cases against the United States. When, however, by statutory enactment the United States conferred upon the courts jurisdiction to hear and decide, it included the power to render judgment, for by that is meant the final decision of the court in the application of the law to the facts established by the evidence. Thus, in section 7 of the act of congress of March 3, 1887, (24 St. at Large, p. 505,) which confers jurisdiction upon the court of claims and the cir-

cuit and district courts over certain claims against the government, it is made the duty of the court to file a written opinion setting forth the findings of fact and conclusions of law, "and to render judgment thereon," and in section 15 of the act of June 10, 1890, (26 St. at Large, p. 131,) under which this proceeding was carried for review into the circuit court, it is enacted that "all final judgments, when in favor of the importer, shall be satisfied and paid by the secretary of the treasury from the permanent indefinite appropriation provided for in section twenty-three of this act." In view of these enactments, it is clear that the circuit court, in reviewing cases of this character, is not limited to giving a mere certificate, but its duty is to hear, decide, and adjudge.

A further exception is taken to the judgment of the circuit court in that it awards costs against the United States, the contention of the district attorney being that the United States cannot be subjected to a liability for costs, and in support of this position are cited the cases of U. S. v. Hooe, 3 Cranch, 73; U. S. v. Barker, 2 Wheat. 395; U. S. v. Boyd, 5 How. 29; In re Chase, 50 Fed. Rep. 695.

At common law, costs, strictly speaking, are not recoverable as an incident to the judgment on the issues litigated. They are recoverable only when authorized by statute. General statutes providing for the recovery of costs by the prevailing party have been held not applicable to the state or national governments, the principal ground for this ruling being the fact that the government, in the absence of direct statutory authority, is not liable to be sued by its citizens. In England it was considered the prerogative of the king not to pay costs, and beneath his dignity to receive them. 3 Cooley, Bl. 400. In the decisions of the supreme court cited by the counsel for the government, it is held that costs are not recoverable against the United States, and this must be accepted as the rule, unless congressional legislation, since the date of these decisions, has subjected the government to a liability for costs in cases of this character.

It will not be questioned that generally costs may now be awarded to the United States when it is the prevailing party, and by the provisions of section 962, Rev. St., it is provided that in all suits by the United States for the recovery of duties on imports—that is to say, in suits involving the same question as that now before us—"the judgment shall recite that it is rendered for duties, and such judgment, with interest thereon and costs, shall be payable in the coin receivable by law for duties." On the other hand, there are a number of statutes in which the liability of the United States to respond for costs is recognized, and methods of procuring payment thereof are provided. Thus, in section 976, Rev. St., it is enacted that in case of suits brought by an informer on a penal statute, wherein the suit is dismissed or judgment is rendered for the defendant, the informer alone shall be liable to the officers of the court for their fees, unless the informer is an officer of the United States, and had probable cause for instituting the suit, "in which case the United States shall be responsible for such fees."

In proceedings for the condemnation of vessels seized as prizes it is provided in section 4640, Rev. St., that when restitution of the vessel is awarded, or in case the court has not funds to cover costs and charges allowed and remaining unpaid, the same "shall be a charge upon and be paid out of the fund for defraying the expenses of suits in which the United States is a party or interested."

In section 1001, Rev. St., is found the general declaration that "whenever a writ of error, appeal, or other process in law, admiralty, or equity issues from or is brought up to the supreme court or a circuit court, either by the United States or by direction of any department of the government, no bond, obligation, or security shall be required from the United States, or from any party acting under the direction aforesaid, either to prosecute said suit or to answer in damages or costs. In case of an adverse decision, such costs as by law are taxable against the United States, or against the party acting by direction as aforesaid, shall be paid out of the contingent fund of the department under whose directions the proceedings were instituted."

On March 3, 1887, was approved the act of congress (24 St, at Large, p. 505) giving to the court of claims and to the circuit and district courts jurisdiction over suits against the United States brought to enforce claims arising under the constitution or any law of congress, and in the fifteenth section of the act it is declared that, "if the government of the United States shall put in issue the right of the plaintiff to recover, the court may, in its discretion, allow costs to the prevailing party from the time of joining such issue. Such costs, however, shall include only what is actually incurred for witnesses, for summoning them, and fees paid to the clerk of the court."

June 10, 1890, the act of congress (26 St. at Large, p. 131) was adopted, which, in the fifteenth section thereof, provides for bringing this class of cases for review before the circuit court, and also for an appeal to the supreme court from the judgment of the circuit court, it being therein provided that "on such application, and on any such appeal, security for damages and costs shall be given as in the case of other appeals in cases in which the United States is a party."

By the act of March 3, 1891, (26 St. at Large, p. 826,) the jurisdiction on appeal over cases of this character arising under the revenue laws was conferred upon the circuit courts of appeals, created by that act.

In reaching a correct solution of the question under consideration it is necessary to read together the several sections we have quoted, for, as is said by the supreme court in U. S. v. Freeman, 3 How. 556-564: "The correct rule of interpretation is that, if divers statutes relate to the same thing, they ought all to be taken into consideration in construing any one of them; and it is an established rule of law that all acts in pari materia are to be taken together, as if they were one law." Not only does it appear that the ancient doctrine of the common law, that it was beneath the dignity of the sovereign to receive costs, has been wholly departed from, but also that in many instances the sovereign has parted with the pre-

rogative of not paying costs, and has consented to be sued in the court of claims and the courts of the United States for claims founded on the constitution or any law of congress. The act of March 3, 1887, confers upon the courts of the United States, in cases wherein the United States puts in issue the claim sued, the discretionary right to award certain costs against the government. In case an appeal is taken from the judgment of the trial court by the government, then the provisions of section 1001 of the Revised Statutes become applicable, in which it is enacted that when the appeal is taken either to the supreme court or a circuit court by the United States security for costs shall not be required, but that in case of a decision adverse to the government in the appellate court such costs as are taxable against the United States shall be paid out of the contingent fund of the department under whose direction the proceedings were instituted. In other words, it is no longer the universal rule that "the United States never pays costs," as was said to be the fact by Chief Justice Marshall, speaking for the supreme court in U. S. v. Barker, 2 Wheat. 395. Whether the prevailing party to a suit against the United States to recover for illegal duties exacted under the provisions of the tariff laws of the United States can recover costs depends upon the provisions of these laws, considered as an entirety. Originally the remedy of a person who, under compulsion, had paid illegal or excessive duties, was to sue the collector in an action at law, counting upon the implied promise of the collector to return that which had been wrongfully demanded. Elliott v. Swartout, 10 Pet. 137. Upon the rendition of the opinion in this case, the collectors, for their own protection, retained in their own hands the duties paid them under protest, and thereupon congress passed the act of March 3, 1839, (5 St. at Large, p. 339,) the second section of which made it the duty of the collectors to pay into the treasury duties paid under protest, and authorizing the secretary of the treasury, when it was shown to his satisfaction that duties had been wrongfully collected and had been paid under protest, to draw his warrant on the treasury in favor of the person entitled to the overpayment.

In Cary v. Curtis, 3 How. 236, it was held by the supreme court that the effect of this act was to deprive the importer of his common-law right of action against the collector, because the latter could not retain the money for his own protection, and was, by the express terms of the statute, compelled to pay the money into the treasury; and hence there was no ground for raising an implied promise on his part to repay it to the importer. This decision was followed by the act of congress of February 26, 1845, (5 St. at Large, p. 727,) which restored the right to maintain an action at law against the collector for duties illegally exacted in whole or in part and paid under written protest, and further deprived the secretary of the treasury of the right to refund overpayments which had been conferred upon him by the act of 1839.

The act of 1845 was in turn repealed by that of June 30, 1864, (13 St. at Large, p. 214,) which provided that the decision of the collector as to the rate and amount of duties should be final, unless

within 10 days the importer should give notice in writing, pointing out specifically the objections relied on, and should appeal to the secretary of the treasury within 30 days; the decision of the secretary being made final unless suit was brought within 90 days. In case the decision of the secretary was favorable to the claimant, he was authorized to draw a warrant upon the treasury for the repayment of the overpayment. The various provisions of the statutes remaining in force were carried into the Revised Statutes, but have now been repealed by the statute of June 10, 1890, (26 St. at Large, p. 131.) The title of the act declares its purpose to be "to simplify the laws in relation to the collection of the revenue," and under its provisions the decision of the collector as to the rate and amount of duties is made final, unless the owner, importer, or person paying the duties charged, shall, within 10 days after the ascertainment and liquidation thereof, give notice in writing of his specific objections to the duty charged, in which case the collector is required to transmit the papers to the proper board of general appraisers provided for in the act, whose decisions in the premises may be reviewed by the proper circuit court of the United States upon application of either the importer or the secretary of the treasury. It thus appears that originally the remedy of the importer for the recovery of illegal charges paid under compulsion was an action at law against the collector. As this was based upon the common law, the general provisions of the statutes of the United States awarding costs to the prevailing party would be applicable, and the importer would be entitled thereto if he prevailed in his suit. This common-law right of action, however, being taken away by the act of March 3, 1839, was not restored by the act of February 26, 1845. That act provided for the bringing of an action at law, but the supreme court, in Arnson v. Murphy, 109 U. S. 238--243, 3 Sup. Ct. Rep. 184, held that the effect of this act was not to restore the common-law action existing previous to March 3, 1839, but that it created a statutory right of action at law, exclusively governed by the provisions of the statutes of the United States. As these statutes then gave costs to the prevailing party, the natural conclusion would be that in actions at law against the collector the right to costs existed; and hence, as we understand it, the practice was, in cases of this character, to award costs against the collector when judgment went in favor of the importer. The judgments thus rendered, including costs, were paid out of the general appropriation applicable thereto, aided by special appropriations, made from time to time. Thus, in section 3689 of the Revised Statutes, it is provided that "there are appropriated out of any moneys in the treasury not otherwise appropriated, for the purposes hereinafter specified, such sums as may be necessary for the same, respectively; and such appropriations shall be deemed permanent annual appropriations: * * * To refund and pay back duties erroneously or illegally assessed or collected under the internal revenue laws; * * * to repay to importers the excess of deposits for unascertained duties, or duties or other moneys paid under protest."

In aid of this general permanent appropriation thus provided for,

special appropriations have also been made from time to time. Thus in the bill passed June 14, 1878, (20 St. at Large, p. 128,) section 3 is as follows: "For repayment to importers the excess of deposits for unascertained duties, or duties or other moneys paid under protest, including interest and costs in judgment cases, $250,000." In appropriation bills passed in 1879, 1880, 1881, and in the succeeding years, are to be found similar provisions for paying interest and costs in judgment cases. It certainly cannot be true that the right of the importer, obtaining judgment for the repayment of duties illegally exacted, to be paid costs, was dependent upon the fact whether he was repaid out of the permanent appropriation or out of a special appropriation made to supply the deficiency in the former. When giving judgment the court cannot possibly foresee whether the particular judgment will be paid out of the permanent or out of a special appropriation, and that unknown and unknowable factor cannot be the measure of the power and duty of the court. If the prevailing party is entitled to costs, judgment therefor should be awarded him. Whether payment thereof can be secured is another question, over which the court has no control. In the passage of these special appropriations congress clearly recognized the right of the importer prevailing in the action to be repaid costs, and thus we find legislative recognition and sanction of the proposition that in the statutory actions at law against the collectors for the recovery of duties paid under compulsion and protest the prevailing party was entitled to costs, and that when rendered against the collector the United States would provide for the payment thereof.

In the enforcement of the collection of the internal revenue taxes the repayment of costs was specifically provided for. Thus, in section 3220 of the Revised Statutes, it is made the duty of the commissioner of the internal revenue "to repay to any collector or deputy collector the full amount of such sums of money as may be recovered against him in any court for any internal taxes collected by him, with the costs and expenses of the suit."

From these several provisions of the acts of congress the inference necessarily to be drawn is that, so long as the remedy of the importer for the recovery of taxes illegally assessed against him and paid under compulsion consisted in the right to bring an action at law against the collector, then the usual statutory rule that the prevailing party was entitled to costs was applicable thereto. Is there anything in the subsequent legislation which changes this rule? The statute of June 10, 1890, provides a different method for bringing the question of the right to recover taxes paid by the importer before the circuit court, but the change is merely as to the method of procedure, and not as to matter of substance. The purpose of the act is to simplify the laws pertaining to the subject-matter, and there is no provision to be found therein which declares that the previously existing right to recover costs shall no longer exist. On the contrary, in section 15 it is declared that "on such original application, and on any such appeal, security for damages and costs shall be given as in the case of other appeals in cases in which the

United States is a party." The fair inference from this declaration is that proceedings under this act of June 10, 1890, in so far as the matter of costs and security therefor on appeal is concerned, are to be governed by the provisions of the statutes on that subject already enacted. Therefore, when the United States is the appellant, no bond or security for costs can be required, but, in case of an adverse decision,—that is, a decision against the United States,—the costs taxable by law against the latter are to be paid out of the proper fund, according to the express provisions of section 1001 of the Revised Statutes.

We find nothing in the act of June 10, 1890, which changes the rule previously existing on this subject, and our conclusion is that in cases of this character the circuit court may award costs against the United States when the decision is adverse to the government.

The judgment of the circuit court is therefore affirmed.