UNITED STATES *v.* CHEMICAL FOUNDATION, INC.

APPEAL FROM THE CIRCUIT COURT OF APPEALS FOR THE THIRD CIRCUIT.

No. 127. Argued December 9, 10, 11, 1925.—Decided October 11, 1926.

1. A decree of the Circuit Court of Appeals, entered prior to the taking effect of the Jurisdictional Act of February 13, 1925, and affirming dismissal on the merits of a bill by the United States to set aside, as unauthorized and fraudulently procured, sales of patent and other rights and properties seized pursuant to the Trading with the Enemy Act, was reviewable by this Court on appeal (Jud. Code §§ 128, 241). Certiorari denied. P. 5.
2. The purpose of the Trading with the Enemy Act was not only to weaken enemy countries by depriving their supporters of their properties, but also to promote production in the United States of things useful for the effective prosecution of the war. P. 9.
3. The Act should be construed liberally to effect its purposes. P. 10.
4. Congress has power to authorize seizure, and use or appropriation, of enemy properties without compensation to their owners. P. 11.
5. Where German properties were seized and sold under the Trading with the Enemy Act, the Act, (including its provision that, after war, enemy claims shall be settled as Congress shall direct,) gave the former owners no rights in, or to question the adequacy of, the proceeds of sale. Moreover, the Treaty of Berlin prevents the enforcement of any claim by Germany or its nationals against the United States or its nationals, on account of such seizures and sales. P. 11.
6. The Act, as amended, (§ 12,) vested the Alien Property Custodian with the powers of a "common law trustee" over all

property other than money taken over by him, with power, under the President, to make any disposition of it, "by sale or otherwise," and to exercise any appurtenant rights or powers "in like manner as though he were the absolute owner." A proviso regulated sales, requiring, *inter alia*, that they be public, to the highest bidder,—"unless the President, stating the reasons therefor, in the public interest shall otherwise determine."

*Held:*

(1) That a disposition of enemy patents, made at private sale to a corporation organized for the purposes of taking over and holding them as a trustee for American industries affected, of eliminating hostile alien interests and advancing chemical and allied industries in the United States through licenses under the patents free to the United States and upon equal terms to others, was within the authority granted by the Act to the President and the Custodian. P. 9.

(2) That empowering the President thus to determine the terms of sale of enemy properties in the light of conditions arising in the progress of the War, was not an unconstitutional delegation of legislative power. P. 12.

7. Under § 5a, providing that the President may exercise any power conferred on him by the Act "through such officer or officers as he shall direct," the power to determine how enemy property should be sold could be delegated; and this also is constitutional. P. 13.

8. An order of the President under § 5a is not invalid because it purports to "vest" the power in another, instead of "to act through" him, nor because of its failure to show that he was an officer, when he was in fact such, appointed by the President and confirmed by the Senate. P. 13.

9. Orders made by the President's delegate describing enemy patents which had been seized by the Alien Property Custodian, and authorizing private sale thereof to the defendant "Foundation," *held* valid exercise of the President's power under § 12 of the Act. P. 14.

10. Evidence claimed to show that such orders were induced by misrepresentation and made without knowledge of material facts, will not be reëxamined in face of concurrent findings of two courts below to the contrary. P. 14.

11. Such orders are supported by the presumption of official regularity, and the validity of reasons stated therein, or the basis of fact on which they rest, will not be reviewed by the courts. P. 14.

12. Order of the President *held* to have ratified and confirmed sales and transfers of patents made by the Alien Property Custodian. P. 15.

13. In making such an order, the President is presumed to have known, and acted in the light of, the material facts. P. 16.

14. Section 41 of the Criminal Code lays down a general rule for the protection of the United States in transactions between it and corporations and to prevent its action from being influenced by anyone interested adversely to it. It is a penal statute and is not to be extended to cases not clearly within its terms or to those exceptional to its spirit and purpose. P. 18.

15. Section 41 of the Criminal Code is inapplicable to affect the validity of transactions carried out under authority conferred on the President by the Trading with the Enemy Act, whereby enemy patents were transferred, for prices less than their commercial value, from the Alien Property Custodian, to the " Chemical Foundation," a corporation, created as an instrumentality to receive and subsequently control the patents in the public interest, the Custodian being the president of the company, and others representing the Government being also representatives of the corporation, but none of them interested in it financially. P. 17.

16. In such case the rule forbidding sale of trust property by the fiduciary to himself or to a corporation of which he is the head does not apply. P. 20.

17. In absence of statutory authority, stenographers' fees and expense of printing transcripts can not be adjudged against the United States. P. 20.

18. This immunity from costs is a sovereign prerogative which can not be waived by the Attorney General or other government counsel in the case. P. 21.

19. Equity Rule 50 does not attempt to allow taxation of stenographers' fees against the United States. P. 20.

5 Fed. (2d) 191, modified and affirmed.

APPEAL from a decree of the Circuit Court of Appeals which affirmed a decree of the District Court (294 Fed. 300) dismissing the bill, on final hearing, in a suit brought by the United States to set aside transactions whereby patents, copyrights, etc., which had been seized as enemy property, were transferred to the defendant corporation by the Alien Property Custodian,

acting, by direction of the President, under authority conferred by the Trading with the Enemy Act.

*Mr. Henry W. Anderson,* Special Assistant to the Attorney General, and *Assistant Attorney General Galloway,* with whom *Solicitor General Mitchell* was on the brief, for the United States.

*Mr. John W. Davis,* with whom *Messrs. Moorfield Storey, Joseph H. Choate, Jr., William G. Mahaffy,* and *Seiforde M. Stellwagen* were on the brief, for appellee.

*Mr. James A. Beha* filed a brief as *amicus curiae* by special leave of Court, on behalf of Friedrich Schott.

MR. JUSTICE BUTLER delivered the opinion of the Court.

Suit was brought by the United States in the District Court for Delaware to set aside sales made by it to the Chemical Foundation of a number of patents, copyrights, trademarks, and other similar properties—which for brevity will be referred to as "patents"—seized pursuant to the Trading with the Enemy Act of October 6, 1917, c. 106, 40 Stat. 411, as amended by the Act of March 28, 1918, c. 28, 40 Stat. 460, and the Act of November 4, 1918, c. 201, 40 Stat. 1020, and other Acts. The complaint alleges that a number of domestic manufacturers as a result of war conditions had been able to combine and monopolize certain chemical industries in this country; and, fearing that at the end of the war German competition would destroy the monopoly, they conspired to bring about transfers and sales of the patents at nominal prices to themselves or to a corporation controlled by them; that the patents so obtained would control the industries in question and perpetuate the monopoly, and that the sales were procured through the fraudulent deception of the President, the Alien Property Custodian, and other offi-

cials. The answer denies conspiracy and fraud and asserts that the transfers were made in good faith and pursuant to law and that they are valid. There was a trial at which much evidence was taken. The District Court dismissed the complaint (294 Fed. 300); and its decree was affirmed by the Circuit Court of Appeals. 5 F. (2d) 191. Both courts found that no unlawful scheme, combination or conspiracy was shown, and that there was no deception or fraud.¹ The United States took an appeal under § 241, Judicial Code, and has applied for a writ of certiorari under § 240. The decree of the Circuit Court of Appeals was entered March 26, 1925, prior to the taking effect of the Act of February 13, 1925, amending the Judicial Code. C. 229, 43 Stat. 936. Since this is not a case in which the decree of that court is made final by § 128, the United States had the right of appeal. The application for certiorari is therefore denied.

The chemical industries in question are closely related to the production of explosives, gases, and other things directly used in waging war, as well as the production of dyestuffs and medicines essential to the welfare of the people. At the outbreak of the war many necessary medicines and other substances as well as most of the dyestuffs used in this country were imported from Germany or were manufactured under patents owned by enemy Germans. The amount of such things here produced was small. Importations were hindered by the blockade, and ceased when this country entered the war. To meet the demand, numerous plants were developed, and, by 1919, chemicals, dyestuffs, medicines and the like were being produced here in large quantities. A number of associations of manufacturers were formed for the advancement of such industries; they included in their membership the producers of nearly all the dyestuffs and like chemicals made in this country. Mr. A. Mitchell Palmer was the Alien Property Custodian until he was

appointed Attorney General, March 4, 1919. In order to
protect the United States against enemy and foreign con-
trol of its chemical industries and to stimulate production
here, he favored the seizure and sale of the patents in
question. To that end, a number of conferences were
held between his representatives and those of the indus-
tries. The plan that was carried into effect was formu-
lated under his direction.

In February, 1919, the Chemical Foundation was incor-
porated under the laws of Delaware. The certificate of
incorporation discloses that it was created and empowered
to purchase enemy-owned patents seized by the Custodian
and to hold the " property and rights so acquired in a
fiduciary capacity for the Americanization of such indus-
tries as may be affected thereby, for the exclusion or
elimination of alien interests hostile or detrimental to the
said industries, and for the advancement of chemical and
allied science and industry in the United States"; to grant
to the United States non-exclusive licenses to make, use
and sell the inventions covered by the patents, and also to
grant like licenses, on equal terms and without advantage
as between licensees, to American citizens and corpora-
tions under control of American citizens. The board of
directors is authorized to prescribe the terms and condi-
tions of such licenses. It may refuse to issue any license
or may revoke any license granted by it. The corporation
is required to enforce its rights and to protect the rights
of its licensees. The authorized capital stock is $500,000,
consisting of 5,000 shares of the par value of $100 each;
4,000 shares constitute non-voting preferred stock, the
holders of which are entitled to a cumulative dividend of
six per centum per annum, and 1,000 shares constitute
the common stock, the holders of which are entitled to
dividends not exceeding six per centum per annum after
dividends on the preferred stock have been provided for.
The preferred stock is subject to redemption at par plus

accumulated dividends, if any, and after such redemption net earnings not needed for working capital "shall be used and devoted, to the development and advancement of chemistry and allied sciences, in the useful arts and manufactures in the United States, in such manner as the board of directors may determine." The holders of the common stock have all the voting power. The certificate provides that, without the approval of the board of directors, stockholders may not sell any of their stock. The board of directors consists of three members. The executive officers are president, vice president, and a secretary and treasurer. The president and vice president are required to serve without pay. The shares of the Foundation were subscribed by those interested in the chemical and dye industries. But a voting trust agreement was made, pursuant to which all common stock was deposited with, and all voting power was vested in, five trustees. Directors and officers were chosen March 8, 1919. Francis P. Garvan, Douglas I. McKay and George J. Corbett were made directors and constituted the board. Mr. Garvan, then Alien Property Custodian, was elected president. Mr. McKay was elected vice-president, and Mr. Corbett secretary and treasurer. Otto T. Bannard and four others were made voting trustees. All the directors, officers and voting trustees were chosen by or in accordance with the direction of Mr. Palmer, given while he was Custodian.

The President, by executive order, December 3, 1918, declared: " I hereby vest in Frank L. Polk all power and authority conferred upon the President by the provisions of Section 12 " of the Trading with the Enemy Act as amended. Mr. Polk was then Counselor for the Department of State, but was not so described in the order, He made two orders, dated respectively February 26, 1919 and April 5, 1919, to authorize the Custodian to sell at private sale to the Foundation, without advertisement, at such places and upon such terms and conditions as to the

Custodian might seem proper, all patents found to relate to the objects and purposes of the Foundation as expressed in its charter. These orders contained a statement of the reasons therefor in the public interest. Briefly they were: that the patents could not be sold to the best advantage at public sale after advertisement; that the Foundation had been incorporated to hold the patents as a trustee for American industries affected by the patents, to eliminate hostile alien interests, and to advance chemical and allied industry in the United States, and that it was obligated to grant non-exclusive licenses upon equal terms to qualified American manufacturers and was empowered to grant free licenses to the United States; that the public interest would be best served by a wide use of the inventions, which most readily could be promoted by licenses which the Foundation was obligated to grant; that a private sale would prevent the patents from falling into the hands of purchasers unwilling or unable to use the inventions, or who would use them for speculative purposes; that it would be impossible to make a public sale that would secure these benefits, and that a private sale would avoid unnecessary expense, delay and inconvenience.

Prior to and contemporaneously with the organization of the Foundation, the representatives of the chemical industries coöperated with those of the Custodian in making lists of the patents to be seized, and sold by the Custodian to the Foundation. Mr. Garvan, the Custodian, from time to time commencing April 10, 1919, executed and delivered to the Foundation various assignments of the patents. The considerations paid by the Foundation to the Custodian amounted in all to $271,850.00. The President, February 13, 1920, made an executive order which was held by both courts below to constitute a ratification of the transactions. And, pursuant to that order, the Custodian confirmed the assignments theretofore made.

We come to the question whether, as held below, the Act, as amended March 28, 1918, empowered the President to authorize, and the Custodian under his supervision to consummate, these sales.

The pertinent provisions of the Act are in § 12 as amended. " The alien property custodian shall be vested with all of the powers of a common-law trustee in respect of all property, other than money, which has been or shall be, or which has been or shall be required to be, conveyed, transferred, assigned, delivered, or paid over to him in pursuance of the provisions of this Act, and, in addition thereto, acting under the supervision and direction of the President, and under such rules and regulations as the President shall prescribe, shall have power to manage such property and do any act or things in respect thereof or make any disposition thereof or of any part thereof, by sale or otherwise, and exercise any rights or powers which may be or become appurtenant thereto or to the ownership thereof in like manner as though he were the absolute owner thereof: *Provided,* That any property sold under this Act, except when sold to the United States, shall be sold only to American citizens, at public sale to the highest bidder, after public advertisement of time and place of sale which shall be where the property or a major portion thereof is situated, unless the President stating the reasons therefor, in the public interest shall otherwise determine: . . . [40 Stat. 460].

"After the end of the war any claim of any enemy or of an ally of enemy to any money or other property received and held by the alien property custodian or deposited in the United States Treasury, shall be settled as Congress shall direct: . . ." 40 Stat. 424.

It is conceded that when seized the patents belonged to enemy Germans and that they were lawfully taken over by the Custodian. The purpose of the Trading with the Enemy Act was not only to weaken enemy countries

by depriving their supporters of their properties, (*Miller v. Robertson*, 266 U. S. 243, 248), but also to promote production in the United States of things useful for the effective prosecution of the war. Section 10(c) authorized the President, if he deemed it for the public welfare, to grant licenses to American citizens or corporations to use any inventions covered by enemy-owned patents. Subsection (c) of § 7 of the Act, as amended November 4, 1918, authorized the seizure of enemy-owned patents and provided that all property so acquired should be held and disposed of as provided by the Act. And there is no ground for contending that the seizure and transfers did not tend to lessen enemy strength and to encourage and safeguard domestic production of things essential to or useful in the prosecution of the war. There is nothing to support a strict construction of the Act in respect of the seizure and disposition of enemy property. On the other hand, contemporaneous conditions and war legislation indicate a purpose to employ all legitimate means effectively to prosecute the war. The law should be liberally construed to give effect to the purposes it was enacted to subserve.

As originally enacted, § 12 gave the Custodian in respect of properties in his possession " all of the powers of a common-law trustee." He was authorized, acting under the supervision and direction of the President and under rules and regulations prescribed by the President, to manage the property and do any act or things in respect thereof, or make any disposition of it by sale or otherwise, and to exercise any rights appurtenant to its ownership, " if and when necessary to prevent waste and protect such property and to the end that the interests of the United States in such property and rights, or of such person as may ultimately become entitled thereto, or to the proceeds thereof, may be preserved and safeguarded." The Custodian was a mere conservator and

was authorized to sell only to prevent waste. But brief experience made it clear that this restriction on the power to dispose of enemy property sometimes operated to defeat the purpose of the Act and brought profit and advantage to the enemy. The amendment of March 28, 1918, eliminated the restriction upon the power of sale. It stated that the other powers given were " in addition " to those of a common-law trustee. And it authorized the Custodian, under the President, to dispose of such properties by sale or otherwise " in like manner as though he were the absolute owner thereof."

There is no support for a construction that would restrain the force of the broad language used. Congress was untrammeled and free to authorize the seizure, use or appropriation of such properties without any compensation to the owners. There is no constitutional prohibition against confiscation of enemy properties. *Brown* v. *United States,* 8 Cranch 110, 122; *Miller* v. *United States,* 11 Wall. 268, 305, *et seq.; Kirk* v. *Lynd,* 106 U. S. 315, 316; *Stoehr* v. *Wallace,* 255 U. S. 239, 245; *White* v. *Mechanics Securities Corp.,* 269 U. S. 283, 300. And the Act makes no provision for compensation. The former enemy owners have no claim against the patents or the proceeds derived from the sales. It makes no difference to them whether the consideration paid by the Foundation was adequate or inadequate. The provision that, after the war, enemy claims shall be settled as Congress shall direct conferred no rights upon such owners. Moreover, the Treaty of Berlin prevents the enforcement of any claim by Germany or its nationals against the United States or its nationals on account of the seizures and sales in question.*

While not denying the power to confiscate enemy properties, the United States argues that, as construed below,

---

*Part X, Section IV, Article 297, and Annex paragraphs 1 and 3, Treaty of Versailles, adopted by Article II(1), Treaty of Berlin, 42 Stat. 1939, 1943.

the provision in question is unconstitutional because it attempts to delegate legislative power to the Executive. But the Act gave the Custodian, acting under the President, full power of disposition. No restriction was put upon dispositions other than by sales. And sales to the United States were not regulated. The general rule laid down was, that all dispositions by sale or otherwise should be made in accordance with the determinations of the President; the proviso made an exception including a class of sales; and, upon the failure of the President otherwise to determine stating the reasons therefor in the public interest, it required that such sales should be made as there specified. It was not necessary for Congress to ascertain the facts of or to deal with each case. The Act went as far as was reasonably practicable under the circumstances existing. It was peculiarly within the province of the Commander-in-Chief to know the facts and to determine what disposition should be made of enemy properties in order effectively to carry on the war. The determination of the terms of sales of enemy properties in the light of facts and conditions from time to time arising in the progress of war was not the making of a law; it was the application of the general rule laid down by the Act. When the plenary power of Congress and the general rule so established are regarded, it is manifest that a limitation upon the excepted class is not a delegation of legislative power. *Field* v. *Clark*, 143 U. S. 649, 692; *Buttfield* v. *Stranahan*, 192 U. S. 470, 496; *Union Bridge Co.* v. *United States*, 204 U. S. 364, 377; *United States* v. *Grimaud*, 220 U. S. 506, 516.

The language of the statute is too plain to be misunderstood. Except as affected by the proviso, the Custodian's dominion over the property, and power to dispose of it—acting under the President as provided—were as unlimited as are the powers of an absolute owner; and the power of the President to determine terms and

conditions of sales or other disposition was not restricted. He was authorized, stating the reasons therefor in the public interest, to dispense with any or all requirements specified in the proviso and to substitute others for them. Cf. *Levinson* v. *United States,* 258 U. S. 198. When the amended section is read in comparison with the original enactment and regard is had to the chemical warfare and other conditions existing at the time of the amendment, March 28, 1918, the inevitable conclusion is, that it empowered the President to authorize, and the Custodian acting under him to consummate, the sales in question.

The United States argues that the executive order of December 3, 1918 was void, and that the one of February 13, 1920 did not authorize or ratify the transactions.

Section 5 (a) of the Act provides that " the President may exercise any power or authority conferred by this Act through such officer or officers as he shall direct." The language of the executive order is: " I hereby vest in Frank L. Polk all power and authority conferred upon the President by the provisions of Section 12 . . ." Obviously all the functions of his great office cannot be exercised by the President in person. The contention that power to determine how enemy property should be sold could not be delegated to another is not sustained. This court has had occasion to consider a like question in *Central Trust Co.* v. *Garvan,* 254 U. S. 554, 567; *Stoehr* v. *Wallace, supra,* 244, and *Commercial Trust Co.* v. *Miller,* 262 U. S. 51, 53. These decisions sustain the delegation here involved.

It is argued that the order was not made in conformity with the statute because to " vest " power in another is not to " act through " him, and because the order did not show that Mr. Polk was an officer. But, if two constructions are possible, and one of them would render the order useless and the other give it validity, the latter is to be adopted. Cf. *Panama R. R. Co.* v. *Johnson,* 264 U. S.

375, 390; *United States* v. *Coombs*, 12 Pet. 72, 75–76. The intention to exert the power conferred under § 5 is plain. Meticulous precision of language was not necessary. *Russell Co.* v. *United States*, 261 U. S. 514, 523. While the use of the word " vest " was not accurate, it must be deemed sufficient when the context and circumstances are considered. Mr. Polk was an officer through whom the President was authorized to act. He was Counselor for the Department of State, appointed by the President and confirmed by the Senate. *United States* v. *Germaine*, 99 U. S. 508. No particular form of designation was required. It would be unreasonable to read the order otherwise than as meaning that, in respect of the matters covered by § 12, the President determined to act through Frank L. Polk, Counselor for the Department of State.

And the validity of each of the orders made by Mr. Polk is attacked by the United States on the ground that it was too broad and constituted an attempt to give to the Custodian the very power granted to the President by the Act; that is, the power to determine that enemy properties should be disposed of otherwise than as specified in the proviso. But the contention cannot prevail. Each of the orders sufficiently described the patents seized and authorized a private sale to the Foundation without advertisement. This was enough to indicate a determination to take these sales out of the class covered by the proviso. And it is insisted that the orders were induced by misrepresentation and were made without knowledge of the material facts. But both courts found that the United States failed to establish any conspiracy, fraud or deception alleged. Findings of fact concurred in by two lower courts will not be disturbed unless clearly erroneous. *Washington Sec. Co.* v. *United States*, 234 U. S. 76, 78. Under this rule the findings must be accepted. The presumption of regularity supports the official acts of public officers and, in the absence of clear evidence to the

contrary, courts presume that they have properly discharged their official duties. *Confiscation Cases*, 20 Wall. 92, 108; *United States* v. *Page*, 137 U. S. 673, 679–680; *United States* v. *Nix*, 189 U. S. 199, 205. Under that presumption, it will be taken that Mr. Polk acted upon knowledge of the material facts. The validity of the reasons stated in the orders, or the basis of fact on which they rest, will not be reviewed by the courts. *Dakota Cent. Tel. Co.* v. *South Dakota*, 250 U. S. 163, 184; *Monongahela Bridge* v. *United States*, 216 U. S. 177, 195; *Martin* v. *Mott*, 12 Wheat. 19, 30. Cf. *Levinson* v. *United States, supra*, 201.

We agree with the lower courts that the sales and transfers of the patents were ratified and confirmed by the President's order of February 13, 1920. It is urged that there was no ratification because it is not shown that the President had knowledge of the material facts; that he did not intend to ratify the sales of patents, and that the language used in the order is not broad enough to include the patents, trademarks and copyrights in question.

The Polk order of February 26, 1919, described the property covered as " all of the letters patent, trade-marks and rights under letters patent and trade-marks, including all profits and damages . . . for the past infringement thereof which the Alien Property Custodian may seize or may have seized .... . and which he from time to time shall determine relate to the objects and purposes " of the Chemical Foundation. The President's order of confirmation recites that the Polk orders authorized the Custodian to sell " certain choses in action and rights, interests and benefits heretofore determined to belong to, or to be held for, by, or on account of, or for the benefit of persons heretofore determined to be enemies." The language last quoted was used to define the same properties that were covered by the Polk orders. That is, " choses in action and rights," etc., were used to

include "letters patent, trade-marks," etc. The President's order also states that it was the *intention* of the Polk orders to authorize the Custodian to sell "all choses in action, rights, interests and benefits under agreements and rights and claims of every character and description including rights to receive moneys by way of royalties or otherwise as compensation for the use of patents, trademarks or tradenames which the Alien Property Custodian may have seized . . . and . . . determined to relate to the objects and purposes " of the Foundation. It recites that doubt had arisen as to the authority of the Custodian to sell and convey to the Foundation " certain of the said choses in action," etc., " including rights to receive moneys by way of royalties or otherwise." And the President expressly authorized the Custodian to sell at private sale without public or other advertisement to the Foundation upon such terms and conditions as to the Custodian might seem proper " all choses in action, rights, interests and benefits under agreements and rights and claims of every character and description which the Alien Property Custodian may seize or may have seized " under the Act. The President further authorized the Custodian by a suitable instrument to confirm and ratify sales theretofore made by him of any property as to which his authority under the Polk orders might be deemed doubtful. And he stated that his reasons for the determination and order were given in the Polk orders and in addition specified other reasons which need not be quoted.

This order authorizes sales of the patents to be made and ratifies and confirms those theretofore made by the Custodian. The President will be presumed to have known the material facts and to have acted in the light of them. His intention to ratify the sales is plain. The comprehensive language used is broad enough to include the patents. Moreover, the statement that his reasons for the determination are given in the Polk orders shows

the intention to cover the properties there referred to. As the transactions in question were ratified, it is unnecessary to consider the objections made by the United States to the procedure of the Custodian under the Polk orders.

The United States contends that the sales were void because made in violation of § 41 of the Criminal Code, 35 Stat. 1088, 1097, and the rule of law forbidding sales by a public officer or fiduciary of trust property in his custody to himself or to a corporation of which he is the head.

Section 41 provides: " No officer or agent of any corporation . . . and no . . . person directly or indirectly interested in the pecuniary profits or contracts of such corporation . . . shall be employed or shall act as, an officer or agent of the United States for the transaction of business with such corporation . . ." Violators are made punishable by fine and imprisonment. The United States lays much stress on these facts: Mr. Garvan, while director of the bureau of investigation, Joseph H. Choate, Jr., chief of the chemical division of that bureau, and Ramsey Hoguet, patent attorney for the Custodian, conferred with the representatives of the chemical industries to arrange to make the seizures and sales of the patents. Later, Mr. Garvan, then Custodian, acted for the United States in making the transfers to the Chemical Foundation of which he was the President. Mr. McKay and Mr. Corbett were directors and officers appointed by the Custodian of various corporations of which he had taken control. Before the transfers were made, Mr. Choate became the general counsel and Mr. Hoguet the patent attorney of the Foundation. Mr. Bannard and the other voting trustees were members of the Advisory Sales Committee—appointed by the President to see that sales of enemy properties were fairly made to qualified buyers. Without further reference to the facts relied on to sup-

port its contention, we assume in favor of the United States that those who acted for it in the transactions complained of were at the same time directors and officers of the corporation; that the members of the Advisory Sales Committee, while they were voting trustees, participated in the fixing of the prices paid for the patents by the Foundation, and that such prices were much less than the value of the properties and would have been inadequate to constitute just compensation if the patents belonged to non-enemy owners and were taken for public use under the power of eminent domain.

Section 41 was enacted when there was no war, and long before the Trading with the Enemy Act. It lays down a general rule for the protection of the United States in transactions between it and corporations and to prevent its action from being influenced by anyone interested adversely to it. It is a penal statute and is not to be extended to cases not clearly within its terms or to those exceptional to its spirit and purpose. *United States* v. *Noveck,* 271 U. S. 201; *Baender* v. *Barnett,* 255 U. S. 224, 226; *Hawaii* v. *Mankichi,* 190 U. S. 197, 212; *United States* v. *Kirby,* 7 Wall. 482, 486; Bishop on Statutory Crimes, (3d ed.), § 235. At the time of the enactment, there were no enemy properties to be dealt with; and, save the generality of the language used, there is nothing to indicate a legislative purpose to deal with that subject. The Trading with the Enemy Act is a war measure covering specifically, fully and exclusively the seizure and disposition of enemy properties. The authority of the President to authorize sales and to determine terms and conditions in lieu of those specified in the proviso, undoubtedly included the power to cause the Chemical Foundation to be incorporated to purchase and hold the patents, as specified, and to direct the selection of the directors, officers and voting trustees. The President, and under him the Custodian, acting for the United

States, the seller of the patents, caused the Foundation to be created to buy and hold them, and caused it to be controlled by officers or representatives of the United States acting exclusively in its interest. Neither Mr. Garvan nor any of the others who acted for the United States had any financial interest in the Foundation, its profits or its contracts. All the corporate shares were subscribed and paid for by others—those interested in the chemical industries. They furnished the money to carry out the plan formulated by or under the direction of Mr. Palmer while he was Custodian. Under the voting trust agreement, shareholders were divested of all voice in the control, business, or affairs of the corporation. All shares are to be held by the voting trustees for 17 years, within which all patents will expire. And, by charter provisions, dividends were limited to six per centum per annum. Transferable certificates of beneficial interest were issued by the trustees to the shareholders, but these cannot be used to control the corporation. The arrangement was intended to amount to a public trust for those whom the patents will benefit and for the promotion of American industries, and to give to them the right to have on equal and reasonable terms licenses to make, use and sell the inventions covered by the patents. The Foundation is properly to be considered an instrumentality created under the direction of the President to effect that disposition and subsequent control of the patents which he determined to be in the public interest. The transactions complained of did not involve any of the evils aimed at by § 41. The Act will be construed and applied as not qualified or affected by that provision of the Criminal Code. *Utah Power & Light Co.* v. *United States,* 243 U. S. 389, 406; *Kepner* v. *United States,* 195 U. S. 100, 125; *Townsend* v. *Little,* 109 U. S. 504, 512; *In re Rouse, Hazard & Co.,* 91 Fed. 96, 100. And, as the power to dispose of the properties

by sales on the terms and conditions specified was included in the grant made by the statute, it follows that the rule in respect of sales of trust properties by fiduciaries does not apply.

Before the commencement of the trial, the District Court found that it was necessary that the testimony be taken down in shorthand and transcribed, and appointed an official stenographer for that purpose; and it was ordered that his fees be ultimately taxed as a part of the costs. By another order, counsel consenting, the court directed that the expense of printing 100 copies of the transcript, to be available for use in that court and on appeal, be advanced from time to time and borne in equal amounts by the parties and form a part of the taxable costs. The decree directs that the Chemical Foundation recover from the United States the money advanced by the Foundation on account of such fees and expenses, and orders the amount to be taxed as costs in the case. The government insists that this is erroneous.

The general rule is that, in the absence of a statute directly authorizing it, courts will not give 'judgment against the United States for costs or expenses. *United States* v. *Hooe,* 3 Cranch 73, 91, 92; *Shewan and Sons* v. *United States,* 267 U. S. 86; *United States* v. *Davis,* 54 Fed. 147, 152, *et seq.* But the Foundation insists that under Equity Rule 50, taken with the consent of counsel and the orders, the court was authorized to direct that these items be taxed as costs and to give judgment against the United States therefor.

Equity Rule 50 in general terms provides that stenographers' fees shall be fixed by the court and taxed as costs, but it does not specify costs or judgment for money against the United States. The rule does not mention the United States and does not affect the sovereign prerogative not to pay costs. Congress alone has power to waive or qualify that immunity. But no statute author-

izes the giving of judgment against the United States for these items or authorizes the Attorney General or other counsel in the case to consent to such a judgment. No such authority is necessary for the proper conduct of litigation on behalf of the United States, and there is no ground for implying that authority. It follows that the direction for judgment against the United States for costs cannot be sustained. That part of the decree will be eliminated; and the decree, so modified, will be affirmed.

*Decree modified and affirmed as modified.*

Mr. Justice Sutherland and Mr. Justice Stone took no part in the consideration or decision of this case.