### UNITED STATES v. HAAR et al.

District Court, S. D. Georgia. April 21, 1927.

1. **Internal revenue** ⬅25—**Where government proved all facts and produced all records connected with income tax assessment, presumption of compliance with all prerequisites did not apply.**

Where government produced all records and made proof of all facts connected with and tending to validate income tax assessment, presumption of compliance with all prerequisites arising from assessment list did not apply.

2. **Constitutional law** ⬅68(4)—**Courts should follow statutory prerequisites to assessment of tax regardless of reasonableness thereof.**

When Congress has determined that certain proceedings must be had before there can be any assessment of a tax, courts should willingly follow such requirements, regardless of whether they seem reasonable.

**3. Internal revenue ⬩25—Making of income tax return is prerequisite to assessment of tax (Rev. St. § 3176, as amended by Revenue Act Sept. 8, 1916, § 16, amended by Revenue Act 1918, approved February 24, 1919, § 1317 [Comp. St. § 5899]).**

Under Rev. St. § 3176, as amended by Revenue Act Sept. 8, 1916, § 16, amended by Revenue Act 1918, approved February 24, 1919, § 1317 (Comp. St. § 5899), and in view of section 8 (b) of Act of 1916, section 223 of Act of 1918, and section 223 of Act of 1921 (Comp. St. § 6336⅛kk), making of a return by taxpayer, or by collector or his deputy, if taxpayer fails to make return, is prerequisite to assessment of income tax and Revenue Act Nov. 23, 1921, § 250, subsec. (d), being Comp. St. § 6336⅛tt, does not change rule.

**4. Internal revenue ⬩28(1)—To obtain dismissal of proceeding for collection of tax by summary assessment, aided by suit in equity, taxpayer need only prove method of assessment was unauthorized.**

When collection of tax is sought by summary assessment, as distinguished from suit to collect tax, even though a suit in equity be brought in aid of assessment in lieu of or as supplemental to distraint, all necessary for the taxpayer to prove, to require dismissal of proceeding, is that method of assessing tax was unauthorized.

**5. Internal revenue ⬩26—Telegram from revenue agent, recommending inmmediate assessment of income taxes, to attach taxpayers' bank deposits, held not "return," authorizing tax lien (Rev. St. § 3176, as amended by Revenue Act Sept. 8, 1916, § 16, amended by Revenue Act 1918, approved February 24, 1919, § 1317 [Comp. St. § 5899]).**

Telegram from revenue agent to Commissioner of Internal Revenue, recommending immediate assessment of income tax against named persons in certain amounts for certain years, for purpose of attaching their bank deposits, held not a "return," or a substitute therefor, required as prerequisite to creation of tax lien against taxpayers' deposits, under Rev. St. § 3176, as amended by Revenue Act Sept. 8, 1916, § 16, amended by Revenue Act 1918, approved February 24, 1919, § 1317 (Comp. St. § 5899).

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Return.]

**6. Internal revenue ⬩25—Taxpayers, obtaining abatement of income tax assessments without asserting invalidity, because of absence of returns, held not estopped to assert invalidity of assessments (Rev. St. § 3176, as amended by Revenue Act Sept. 8, 1916, § 16, amended by Revenue Act 1918, approved February 24, 1919, § 1317 [Comp. St. § 5899]).**

That taxpayers sought and obtained abatements from original income tax assessments, without asserting that assessments were void, because of absence of the return required by Rev. St. § 3176, as amended by Revenue Act Sept. 8, 1916, § 16, amended by Revenue Act 1918, approved February 24, 1919, § 1317 (Comp. St. § 5899), did not estop them from asserting invalidity of assessments in subsequent suit by government, in absence of proof that government had foregone anything or acted to its hurt because of such abatements or omissions of assessments.

**7. Estoppel ⬩56—Essence of "estoppel" is action or inaction to another's detriment.**

The essence of "estoppel" is action or inaction to one's detriment, by reason of the act or omission of the other party on which the plea of estoppel is based.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Estoppel.]

In Equity. Suit by the United States against William H. Haar and another. On defendants' motion to dismiss the bill and its amendments. Motion granted.

White B. Miller, of Chattanooga, Tenn., and Chas. L. Redding, U. S. Atty., of Savannah, Ga., for the United States.

Lawrence & Abrahams, Bouhan & Atkinson, Lawton & Cunningham, and T. M. Cunningham, all of Savannah, Ga., for defendants.

BARRETT, District Judge. The liability of W. H. Haar and F. H. Haar for income tax came under investigation in 1922 by officials of the Internal Revenue Department of the United States. On July 13, 1922, Thos. E. Stone, revenue agent in charge, sent the following telegram:

"To Commissioner of Internal Revenue, Treasury Building, Washington, D. C. Recommend immediate assessment income tax Frederick H. Haar, Savannah, Georgia, nineteen seventeen, fourteen thousand six hundred eighty-two dollars and thirty-five cents; nineteen eighteen, thirty-six thousand three hundred eighty-two dollars and thirty-eight cents; nineteen nineteen, twenty-one thousand seventy dollars and forty-one cents; nineteen twenty, one thousand seventy dollars and forty-one cents; nineteen twenty, five thousand seven hundred fifty-nine dollars and twenty-three cents; nineteen twenty-one, fifteen thousand nine hundred forty-one dollars and seventy-nine cents. Stop. Will H. Haar, trading as Dixie Supply Company, Savannah, Georgia, nineteen seventeen, nine thousand twenty-one dollars and seventy-three cents; nineteen eighteen, forty-one thousand nine hundred five dollars and ninety cents; nineteen nineteen, one thousand two hundred eighty-two dollars and sixty-four cents; nineteen twenty, three hundred fifty-six thousand sixty-seven dollars and forty-eight cents; nineteen twenty-one, eight hundred thirty-four thousand nine hundred twenty-six dollars and fifty-four

cents; nineteen twenty-two, six hundred fifty-eight thousand two hundred forty-five dollars and seventy-six cents. Stop. Above assessments recommended purpose attaching certain deposits in banks to credit of these taxpayers. Stop. Fred H. Haar now under bond for failure to pay tax as provided by law. Stop. Immediate confirmation to collector essential."

On July 14, 1922, D. H. Blair, Commissioner of Internal Revenue, signed a paper captioned in large letters: "Assessment Certificate." The pertinent portions of the body of the certificate are:

"I hereby certify that the individuals, firms, and corporations reported by me on the attached lists are liable for the amount of taxes, penalties, etc., entered opposite their names, and that the amounts thereof are as follows: Dated at ———. Office of Collector of Internal Revenue 666 ——— 192—— ———, Collector of Internal Revenue." (Blank lines unsigned.)

Separated from the above by a dividing line across the sheet there are four columns in the body of the certificate, captioned "List," "Returns Filed," "Excess Collections," "Total Tax." There are no entries in any of these columns. In the body of the certificate are two lines, one marked "Totals Reported by Collector," and one marked "Differences Found by Commissioner." There are no entries on these lines. The next line is marked "Items Reported by Commissioner," and opposite that is "1,995,336.21," and immediately below it another line, marked "Total Assessment," with the same figures entered. Then follows this certificate, signed by the Commissioner:

"I hereby certify that I have made inquiries, determinations, and assessments of taxes, penalties, etc., of the above classification specified in these lists, and find that the amounts of taxes, penalties, etc., stated as corrected by the statement of differences and as specified in the supplementary pages of this list made by me are due from the individuals, firms, and corporations opposite whose names such amounts are placed, and that the amount chargeable to the collector is as above.

"Dated at Washington, D. C., Office of Commissioner of Internal Revenue, Jul. 14, 1922. D. H. Blair, Commissioner of Internal Revenue."

Attached to the said assessment certificate is a paper captioned "Assessment List." On this list appears five entries against "Haar, Frederick H., Savannah, Ga.," and opposite each such entry are six columns,

19 F.(2d)—26

marked respectively "Old Balance," "Date," "Debit," "Credit," "New Balance," "Remarks." In the column marked "New Balance" are the following entries, respectively: "14682 35," "36382 38," "21070 41," "5759 23," "15941 79," and under the column "Remarks" is entered these words and figures: "1917 1040 Dummy OL 7/1422," "1918 1040 Dummy OL 7/14/22," "1919 1040 Dummy OL 7/14/22," "1920 1040 Dummy OL 7/14/22," "1921 1040 Dummy OL 7/14/22."

On the same sheet there are five entries against "Haar, Will H., Trading as Dixie Supply Co., Savannah, Ga.," 1, 4, and 5 of which entries have opposite them respectively, under the column "New Balance" "9021 73," "356067 48," and "834926 54," and under "Remarks," respectively, "1917 1040 OL 7/14/22 Dummy," "1920 1040 Dummy OL 7/14/22," "1921 1040 OL 7/14/22 Dummy." Opposite column 2 under "Old Balance" are the figures "41955 90"; under "Date" the entry "1/15/24"; under "Credit" the entry "11404 37"; under "New Balance" the entry "41955 90"

"30551 53," and under "Remarks" "1918 1040 Dummy SCH 7993 OL 7/14/22." Opposite the third column, under the columns marked, respectively, "Old Balance," "Date," "Credit," "New Balance," and "Remarks" are the following figures, "1282 64", "1/15/24", "436 54", "1282 64"

"846 10," and "1919 1040 Dummy SCH 7993 OL 7/14/22."

On July 15, 1922, the collector in charge, through his deputy, filed with certain banks a notice of tax lien as follows:

"Treasury Department, Internal Revenue Service. Form 668. Revised March, 1922. Notice of Tax Lien under Internal Revenue Laws. United States Internal Revenue, District of Georgia.
"July 15, 1922.

"Pursuant to the provisions of section 3186 of the Revised Statutes of the United States, as amended by Act March 4, 1913 (37 Stat. 1016), notice is hereby given that there have been assessed under the internal revenue laws of the United States against the following named taxpayer taxes (including penalties) which after demand for payment thereof remain unpaid, and that by virtue of the above-mentioned statute the amount of said taxes, together with interest, penalties, and other costs that may accrue in addition thereto, is a lien in favor

of the United States upon all property and rights to property belonging to said taxpayer, to wit: Name of taxpayer, William H. Haar; residence or place of business, Savannah, Chatham county, Georgia. Nature of tax income, ———. Taxable period, 1917, 1918, 1919, 1920, 1921, 1922. Amount of tax assessed $1,901,500.05. Additional (penalty) tax assessed, $———. Date assessment list received, July 14, 1922. Deposit.

"J. T. Rose, Collector,
"by J. B. Kieffer, Deputy Collector."

On July 20, 1922, the United States filed in this court an equitable petition against the said W. H. Haar and F. H. Haar and certain banks and other defendants, setting forth the aforesaid assessments against W. H. Haar and F. H. Haar; that the tax liens had been recorded "in the records of Chatham county, Georgia," and that "under the laws of the United States a period of ten days must elapse before there can be the issuance of a distraint warrant and a proper levy on the property of said defendants"—and praying for an injunction against the defendants disturbing the status. Thereafter by appropriate amendments the bill was enlarged in its scope, the details of which are immaterial to the question now for determination.

On January 4, 1924, the said Commissioner of Internal Revenue signed another assessment certificate against Wm. H. Haar for $641,313.86. The details of this assessment are not set forth, because the determination as to the previous assessment will control as to this. As a result of application for abatement of the tax assessed, such assessment had been reduced at the time of the trial to $175,786.40, plus penalties of $62,319.32—total, $238,105.72. Lawrence & Abrahams and Bouhan & Herzog claimed to be the assignees for value of a portion of certain funds in one of the defendant banks.

A hearing was had on the bill as amended January 3 to 8, 1927. At the time of such hearing a motion was made by counsel for W. H. Haar and F. H. Haar, and by counsel for Lawrence & Abrahams and Bouhan & Herzog, to dismiss the bill, for the reason that the assessments of taxes were illegally made, because there was no *return* upon which said assessments were based, by either the taxpayers, or by the collector or deputy collector, or by the Commissioner of Internal Revenue. There are some references to *returns* having been made by W.

H. Haar for the years 1917 and 1921, but there was no proof of them, and it is recognized throughout that the assessments were manifestly in disregard of such *returns,* and were based wholly upon the information transmitted by Thos. E. Stone, revenue agent in charge.

[1] 1. The United States iterates and reiterates the argument that, even if a return be required, the motion to dismiss should not be sustained, because of the presumption arising from the assessment list that all prerequisites have been complied with. Western Express Co. v. United States, 141 F. (C. C. A. 8th Cir.) 28, 30; Germantown Trust Co. v. Lederer, 263 F. (C. C. A. 3d Cir.) 672; United States v. Chemical Foundation, 272 U. S. 1, 47 S. Ct. 1, 71 L. Ed. ——.

This is not a case of presumption, but one where proof of all facts are made. The United States produced under notice *all* records connected with the assessment and which tended to validate it. Nothing more can be presumed. The suggestion that "1040 Dummy" under remarks implies a return cannot be given weight, for the reason that it is proven that the sole basis of the assessment was the telegram from the said revenue agent in charge.

2. Section 3176 of the Revised Statutes, as amended by the Revenue Act of September 8, 1916, § 16, controlled until it was itself amended by the Revenue Act of 1918, approved February 24, 1919, § 1317 (Comp. St. § 5899). This section, prior to the amendment of 1919, was, so far as applicable, as follows:

"If any person, corporation, company, or association fails to make and file a return or list at the time prescribed by law, * * * or makes, willfully or otherwise, a false or fraudulent return or list, the collector or deputy collector shall make the return or list from his own knowledge and from such information as he can obtain through testimony or otherwise. * * * Any return or list so made and subscribed * * * by a collector or deputy collector * * * shall be prima facie good and sufficient for all legal purposes. * * * The Commissioner of Internal Revenue shall * * * assess all taxes, other than stamp taxes, as to which returns or lists are so made * * * by a collector or deputy collector. * * *"

The substance of the amendment of 1919 was that it inserted as the second sentence of said section the following: "In any such case the Commissioner may, from his own

knowledge and from such information as he can obtain through testimony or otherwise, make a return or amend any return made by a collector or deputy collector."

In all of the income tax laws there is a requirement that the taxpayer shall make a return. Substantially the form of the return is that it shall "set forth specifically the gross amount of income from all separate sources, and from the total thereof deducting the aggregate items of allowance herein authorized." Act 1916, § 8(b); Act 1918, § 223; Act 1921, § 223 (Comp. St. § 6336⅛kk).

Under the acts of 1916 and 1919 the only officer authorized to assess a tax under section 3176 was the Commissioner of Internal Revenue, but under both of such acts the collector or his deputy had a duty in the event of the taxpayer making no return or a false return, and this is that he (the collector or deputy collector) "shall make a return."

Under the act of 1916 it is manifest that there could be no assessment until the *collector* or his *deputy* had made such return after the failure on the part of the taxpayer so to do. It is especially significant that in the amendment of 1919 the power was given to the Commissioner, not to *assess the tax,* for that he already had, but to *make a* return, or amend any return made by a collector or deputy collector. It is further significant that, in this paragraph thus amended, there are the two distinct powers granted the Commissioner. One is to *make* or *amend* the *return,* and the other is "to determine and assess all taxes, other than stamp taxes, *as to which returns or lists are so made under the provisions of this section."* Does not this last language negative the right to assess taxes, except those as to which *returns* are made, and does it not declare that returns are prerequisite to assessment?

[2] When Congress has determined that certain proceedings must be had before there can be any assessment of a tax, the courts should willingly follow such requirements, whether or not they seem reasonable. But the requirement for *returns* does seem reasonable. It must be remembered that the *ex parte* assessment of a tax which, when properly filed, creates a lien on all the property of the defendant, is a drastic proceeding, and every precaution should be taken, consistent with the protection of the government, against such assessment resulting in injustice.

In this case only the total amount of the assessment is shown, and it is not discoverable from an examination thereof in what way such conclusion was reached. Seemingly in this case the *gross* income of the defendant W. H. Haar, so far as discoverable, was treated as *net* profits. Even if such income had been net profits, the tax could not have been for the *full amount* thereof. If the method were shown by a *return* to have been that which was seemingly pursued, might it not be concluded to be so arbitrary as to justify interference at the outset with its enforcement, or at least to justify the refusal of aid from a court of equity? Are not citizens, both those who are immediately concerned and others, entitled to know whether or not the authorities vested with this great power are exercising it in fairness and moderation? And are they not entitled to have a record *made up at the time* which will permanently and accurately disclose such methods? What is there to show, in merely furnishing the gross amount of the assessment, that a wrong rate was not charged? What is there to enable the taxpayer to be advised as to what he might ask to be abated? Why should there not be required that the collector or Commissioner, whichever makes the return, should at least show the information obtained as far as practicable? Accuracy is not required, but an honest effort should be made and a contemporary record kept.

[3] In the absence of other controlling legislation, it is to me quite clear that Congress did definitely require as an essential preliminary to the assessment of income tax that there should be made a *return.* It is urged by the government that section 250, subsec. (d), of the Revenue Act approved November 23, 1921 (Comp. St. § 6336⅛tt), makes it apparent that a return is not necessary, and especially this proviso in the act: "That in the case of a false or fraudulent return with intent to evade tax, or of a failure to file a required return, the amount of tax due may be determined, assessed, and collected, and a suit or proceeding for the collection of such amount may be begun, at any time after it becomes due"—emphasis being laid upon the word "determined." My reading of such section induces a very different conclusion. The entire section 250 deals with "payment of taxes." The opening sentence of subsection (d) is:

"The amount of income, excess profits, or war profits taxes due under any *return* made under this act for the taxable year 1921 or succeeding taxable years shall be determined and assessed by the Commission-

er within four years after the *return* was filed, and the amount of any such taxes due under any *return* made under this act for prior taxable years * * * shall be determined and assessed within five years after the *return* was filed, unless both the Commissioner and the taxpayer consent in writing to a later determination, assessment, and collection of the tax; and no suit or proceeding for the collection of any such taxes due under this Act or under prior income, excess profits, or war profits tax acts * * * shall be begun, after the expiration of five years after the date when such *return* was filed, but this shall not affect suits or proceedings begun at the time of the passage of this act." (All underscoring supplied.)

While this and the remaining portion of the subsection are dealing particularly with limitations as to time, it will be observed throughout what has been quoted and the remainder of the section that a *return* is always deemed essential. The time from which the statute of limitations runs is shown throughout to be from the time "the *return* was filed." If no *.return,* when will the running of the statute commence? The proviso quoted by the ·government is merely to the effect that, in the case of a false or fraudulent *return,* or of the failure to file a required *return,* there is no statute of limitations. The case of Bowers v. New York & Albany Lighterage Co. (decided by ° the Supreme Court of the United States Feb. 21, 1927) 47 S. Ct.: 389, 71 L. Ed. ——, makes it obvious that section 250(d) ·of the Revenue Act of 1921 dealt with the statute of limitations as affecting the collection of taxes.

[4] 3. It is urged by the United States that the case of Anderson v. Farmers' Loan & Trust Co. (C. C. A. 2d. Cir.) 241 F. 322, should control. The cases are greatly different. There the suit was to recover a tax paid under protest; here was the summary action by an officer of the United States, fixing the amount of the tax, with the presumption that it is correct, and having the immediate effect of a lien. There the burden was on the taxpayer, not only to prove that "the Commissioner proceeded without proper evidence, or otherwise erroneously," but also "that the tax collected, or some part of it, was not due"; here it is sufficient to prove that "the exact method of their [the taxes] collection was not authorized." There the officers of the taxpayer submitted letters in the nature of returns, though lacking in one element essential to the assessment.

The court evidently considered these letters as a return, for it says: "The Commissioner might have required a *further return."* Here it is proven that no returns were made, unless the above-quoted telegram be such. [5] 4. Is such telegram, quoted above, a *return* or a substitute therefor? Not only does such telegram fail to contain the elements requisite for a return, but there is nothing in it to manifest an attempt to make a return or any substitute therefor. [6, 7] 5. It is urged by the United States · that, because the defendants sought and obtained abatements from the original assessments without disclosing their contention that the assessment was void in the absence of a return, they are now estopped from asserting such contention of invalidity. There is no proof or insistence that the United States has in any way foregone anything or acted to its hurt by reason of such abatements, or of the omission to assert more promptly the attack upon the validity of the assessments. The essence of estoppel is action or inaction to one's detriment, by reason of the act or omission of the other party upon which the plea of estoppel is based. There is no estoppel here.

The motion to dismiss the bill and its amendments will be granted.