**Harry E. BAILEY et al.**

v.

**The UNITED STATES.**

**No. 405–81C.**

United States Claims Court.

Oct. 20, 1983.

for certification purposes. *Id.,* 2 Cl.Ct. at 389.

Steven M. Angel, San Antonio, Tex., for plaintiffs.

M. Susan Burnett, Washington, D.C., for defendant. Asst. Atty. Gen. J. Paul McGrath, David M. Cohen and Donnie Hoover, Washington, D.C., of counsel.

## MEMORANDUM OF DECISION

WHITE, Senior Judge.

This is an action by 30 plaintiffs who were employed throughout the year 1975 (and previously) as quality control inspectors by the United States Air Force at the Oklahoma City Air Logistics Center, Tinker Air Force Base, Oklahoma.

The Oklahoma City Air Logistics Center is one of the five Air Logistics Centers which comprise the Air Force Logistics Command. All of the Air Logistics Centers are concerned with the movement and distribution of goods and material for the Air Force, and with the repair and maintenance of Air Force weapons systems, including military aircraft. (As witnesses at the trial usually referred to the Oklahoma City Air Logistics Center merely as "Tinker AFB," this abbreviated form of reference will generally be used hereafter by the court.)

Before 1975, the plaintiffs were Wage Grade (or blue collar) employees. In 1975, the plaintiffs' Wage Grade jobs were reclassified and converted, through a procedure to be described later in some detail, to General Schedule grades. They assert in the present litigation that they were disadvantaged financially in connection with the conversion, and they sue for damages.

It appears that, with the exception of one plaintiff, the plaintiffs are not entitled to recover. The one exception is the plaintiff Tom L. Clark, who, as explained later, is entitled to recover on a claim for environmental differential pay.

### The Reclassification of Inspector Jobs

Before and during 1975, Tinker AFB employed numerous civilian inspectors. They were of two principal types: (1) those whose jobs mainly involved the examination, and either the acceptance or rejection, of items produced by or for Tinker AFB (i.e., "regular" inspectors); and (2) quality control inspectors, whose duties and responsibilities extended beyond the acceptance or rejection of items and involved processes and procedures to improve the quality of items produced by or for Tinker AFB. The quality control inspectors (and presumably the regular inspectors) were distributed among the five divisions which made up the Directorate of Maintenance at Tinker AFB.

The jobs of all the inspectors at Tinker AFB were classified before 1975 as Wage

Grade jobs in accordance with single-agency job grading standards which were applicable only to Air Force inspectors. The Air Force single-agency standards had been approved by the Civil Service Commission (now the Office of Personnel Management), but they were not part of the Coordinated Federal Wage System. The grades allocated to the different inspector jobs under the single-agency standards varied in accordance with the difficulty and complexity of the duties performed by the various inspectors.

As part of an overall effort to consolidate and eliminate unnecessary classification standards and to bring as many positions as possible under the Coordinated Federal Wage System, the Civil Service Commission, on October 26, 1973, issued Federal Personnel Manual ("FPM") No. 532–60. In this document, the Civil Service Commission issued new job grading standards for non-supervisory inspector jobs throughout the federal service. These new job grading standards were to eliminate and replace the single-agency job grading standards for non-supervisory inspector jobs in all government agencies, including the Air Force. A deadline was fixed by the Civil Service Commission for the program of bringing all non-supervisory inspector jobs under the new job grading standards; and, as later extended, the deadline was July 30, 1975.

The Headquarters of the Air Force supplemented FPM Letter No. 532–60 through the issuance, on April 8, 1974, of an explanatory communication to all major commands of the Air Force, including the Air Force Logistics Command. This communication stated (among other things) that "730 positions [in the Air Force] are quality control type inspectors for which the new Commission standards do not provide sufficient guidance as to appropriate classification treatment"; and that "[e]ach of the * * * positions will entail an in-depth review to determine whether the duties assigned and performed fall within the purview of the referenced Commission standards or whether other classification treatment is warranted."

After the issuance of the Air Force's communication dated April 8, 1974, the Headquarters of the Air Force Logistics Command, on July 5, 1974, sent to the several Air Logistics Centers some "Guidance and Instructions" on the application of the new job grading standards for inspector jobs. This communication stated (among other things) that the most significant aspect of the new job grading standards "is the noncoverage of Wage Grade Quality Control Inspector positions by the new CSC classification standard"; and that "[a]bout 900 WG Quality Control Inspector positions within the AFLC must be realigned to either GS–1960–0 classification standards or to the new job grading standards for Inspectors."

Following the issuance by the Civil Service Commission, the Air Force, and the Air Force Logistics Command of the communications previously mentioned, the classification officials at Tinker AFB began an audit of all the inspector jobs at Tinker AFB to determine whether the duties and responsibilities assigned to and performed by the occupants of the jobs did or did not fall within the purview of the new job grading standards. The audit was conducted on a job-by-job basis within the different divisions of the Directorate of Maintenance. If the determination was affirmative in a particular case, the job was reclassified and given a new Wage Grade classification within the Coordinated Federal Wage System. If, on the other hand, it was determined that a particular inspector job did not fall within the purview of the new job grading standards, the classification officials reclassified the job and assigned to it a grade in a General Schedule series believed to be appropriate.

During the audit and reclassification process at Tinker AFB, the reclassification officials determined that the regular inspector jobs fell within the purview of the new job grading standards. Accordingly, such jobs were reclassified as Wage Grade jobs and assigned grades within the Coordinated Federal Wage System.

On the other hand, the classification officials concluded that, inasmuch as the quality control inspectors at Tinker AFB worked in a quality improvement environment, their jobs did not fall within the purview of the new job grading standards for non-supervisory inspector jobs. Instead, the classification officials decided that the preexisting 1960 series of the General Schedule was the most appropriate series within which to reclassify the jobs of the quality control inspectors. Accordingly, these jobs were reclassified within the 1960 series of the General Schedule and were assigned grades of GS–7 or GS–8, depending on the difficulty and complexity of the duties assigned to and performed by the occupants of the several positions. These reclassifications did not involve any change in the job descriptions for the quality control inspectors, or any change in the actual duties performed by the occupants of the various positions, or any change in the relative standing of the various quality control inspectors within the organizational structural at Tinker AFB.

The dates on which the quality control inspector jobs within the different divisions were reclassified as General Schedule grades varied from March 26, 1975 (Industrial Products Division) to April 7, 1975 (Aircraft Division).

### The Pay Adjustments

A fairly complex procedure was required to effectuate the reclassification of the quality control inspector jobs at Tinker AFB, and accomplish the adjustment of these inspectors' pay from Wage Grade rates to annual salaries within the various General Schedule grades. The pay adjustments incidental to the reclassification of the jobs were made effective on different dates for the five divisions in the Directorate of Maintenance. These effective dates varied from July 13, 1975 (Aircraft Division) to March 7, 1976 (Industrial Products Division).

On the effective date for pay adjustments within a division, if the Wage Grade rate of a quality control inspector (expressed in terms of annual pay) immediately before the pay adjustment date was the same as the annual salary assigned to a step within the General Schedule grade in which his or her position was reclassified, the inspector's annual salary after the pay adjustment was the same as his previous Wage Grade rate. On the other hand, if the Wage Grade rate of an inspector immediately before the effective date of the pay adjustments for the division fell between two salary steps assigned to his or her new General Schedule grade, the inspector's new General Schedule salary was fixed as the higher of the two steps as a result of the pay adjustment. Furthermore, if the Wage Grade rate of an inspector immediately before the effective date of the pay adjustments for the division was higher than the highest salary step assigned to his or her new General Schedule grade, the inspector was permitted to retain the former Wage Grade rate as the salary of the new General Schedule grade after the pay adjustment.

Thus, the pay adjustments for quality control inspectors incidental to the reclassification of their jobs from the Wage Grade system to General Schedule grades did not, in any instance, result in a decrease in the annual pay rate for any of the quality control inspectors, including the plaintiffs. In some instances, for reasons explained in the previous paragraph, the General Schedule annual salaries of quality control inspectors were actually higher than their Wage Grade rates (expressed in terms of annual pay) had been.

### The Pay Increase of October 19, 1975, for Wage Grade Employees

Wage rate surveys are conducted annually at Tinker AFB for the purpose of gathering data concerning the pay rates paid by private industry to blue-collar personnel within some area of the general region where the cost of living is regarded as being comparable to that in the Oklahoma City area. The data so collected are forwarded to the Department of Defense wage-fixing authority and are used by that authority in setting pay rates for Wage Grade employees in the Oklahoma City

area. Such a survey was begun by Tinker AFB on August 12, 1975. New pay rates for Wage Grade employees, to be calculated on the basis of the survey data, were to be effective October 19, 1975.

Pursuant to the 1975 wage rate survey, new pay rates for Wage Grade employees in the Oklahoma City area were made effective October 19, 1975.

In accordance with the new pay rates, as subsequently adjusted, the Wage Grade employees at Tinker AFB received an increase of 22.5 percent in their basic wage rates effective October 19, 1975.

As indicated previously, the quality control inspectors assigned to the Industrial Products Division at Tinker AFB had not, as of October 19, 1975, gone through the pay adjustment procedure incident to the conversion of their Wage Grade jobs to General Schedule grades, and they were still receiving pay as Wage Grade employees on October 19, 1975. Consequently, the quality control inspectors assigned to the Industrial Products Division received the benefit of the 22.5 percent pay increase effective October 19, 1975. Later, when these inspectors went through the pay adjustment procedure, the 22.5 percent pay increase was included in fixing their new General Schedule salaries.

However, the quality control inspectors assigned to the four other divisions in the Directorate of Maintenance at Tinker AFB, including all of the plaintiffs in this case, had gone through the pay adjustment procedure before October 19, 1975. As they were receiving General Schedule salaries as of October 19, 1975, and not Wage Grade pay, the quality control inspectors assigned to divisions other than the Industrial Products Division, including the plaintiffs, did not receive the benefit of the 22.5 percent pay increase for Wage Grade employees on and after October 19, 1975.

As a result of the developments mentioned in this part of the decision, there was a wide discrepancy on and after October 19, 1975, between the pay of the quality control inspectors assigned to the Industrial Products Division and the pay of the quality control inspectors assigned to the other four divisions in the Directorate of Maintenance.

As previously stated, the plaintiffs in this case were all quality control inspectors assigned to divisions other than the Industrial Products Division as of October 19, 1975. Hence, the General Schedule salaries of individual plaintiffs on and after that date were each some thousands of dollars lower than the individual salaries of the quality control inspectors assigned to the Industrial Products Division, even in instances where the General Schedule grades of the plaintiffs were higher than the General Schedule grades of quality control inspectors assigned to the Industrial Products Division.

### The Plaintiffs' Claim

The plaintiffs' theory of the case, as reflected in the complaint (formerly petition), was that the plaintiffs were suing for back pay because the Government "reduced the grade and pay of the plaintiffs" in the course of changing the classifications of their jobs from the Wage Grade system to General Schedule grades.

As indicated earlier in the opinion, the evidence adduced at the trial did not support the claim set out in the complaint. None of the plaintiffs sustained any reduction in annual pay as a result of the reclassification and conversion procedure. Although the previous grades assigned to the plaintiffs' jobs under the Wage Grade system were higher numerically than the GS–7 or GS–8 grades assigned to their respective positions under the General Schedule, the salaries of the plaintiffs as General Schedule employees after the pay adjustments were not lower, in any instance, than their Wage Grade rates (expressed in terms of annual pay) had been.

Not only was there no reduction in the annual pay rate for any of the plaintiffs as a result of the reclassification of their jobs from the Wage Grade System to General Schedule grades, but the reclassification process did not result in any change in the duties assigned to and performed by the plaintiffs, or in any change in the relative

standing of the plaintiffs within the organizational structure at Tinker AFB.

■ Except for certain limited types of cases which have no applicability to the present situation, the authority of this court, as successor to the former United States Court of Claims, extends only to the granting of money judgments (plus incidental collateral relief) to persons who have sustained damages of a pecuniary nature from improper governmental actions within the ambit of 28 U.S.C. § 1491(a)(1), as amended by section 133(a) of the Federal Courts Improvement Act of 1982 (Pub.L. 97–164, 96 Stat. 25, 40). *See United States v. Jones,* 131 U.S. 1, 9 S.Ct. 669, 33 L.Ed. 90 (1889); *Prentiss v. United States,* 115 Ct.Cl. 78, 81 (1949); *Austin v. United States,* 206 Ct.Cl. 719, 722–23 (1975). Therefore, as the plaintiffs failed to prove that they sustained financial losses when the pay adjustments were made as incidents of the reclassification and conversion of their jobs from the Wage Grade system to General Schedule grades, they are not entitled to recover on the basis of the reclassification and conversion.

At the trial of the case, plaintiffs' counsel articulated a concept of the plaintiffs' claim different from that reflected in the complaint. He contended at the trial that if the officials at Tinker AFB had done what they were supposed to do in connection with the reclassification and conversion of the quality control inspector jobs, the conversion of the plaintiffs' Wage Grade jobs to General Schedule grades, and the incidental pay adjustments, would not have occurred until sometime after October 19, 1975, and the plaintiffs would have received the benefit of the 22.5 percent pay increase which all Wage Grade employees at Tinker AFB received effective October 19, 1975.

According to plaintiffs' counsel, the officials at Tinker AFB were supposed to, but did not: (1) make a proper audit of the quality control inspector jobs by consulting each inspector concerning the nature of the duties actually performed by him or her; (2) coordinate all reclassification actions with the Civil Service Commission; and (3) secure the approval of the Air Force Logistics Command before taking any of the personnel actions involved in the reclassification process.

As stated by plaintiffs' counsel, the classification officials did not consult all of the quality control inspectors at Tinker AFB, including some of the plaintiffs, in connection with the 1975 audit of the quality control inspector jobs. In some instances, the classification officials merely relied on inspectors' personnel files at Tinker AFB in reclassifying the particular jobs. The plaintiffs did not establish by evidence, however, that personal consultations with all the quality control inspectors were essential to the conduct of a proper audit. In the absence of such proof, it must be presumed that the classification officials at Tinker AFB conducted a proper audit of the quality control inspector jobs in connection with the reclassification of such jobs. *United States v. Chemical Foundation,* 272 U.S. 1, 14–15, 47 S.Ct. 1, 6, 71 L.Ed. 131 (1926); *Hirsch v. United States,* 205 Ct.Cl. 256, 260, 499 F.2d 1248, 1250 (1974).

The evidence in the record does not show whether the officials at Tinker AFB did or did not coordinate all reclassification actions with the Civil Service Commission, or whether such officials did not secure the approval of the Air Force Logistics Command before taking any of the personnel actions involved in the conversion program, although the evidence does show that the auditing data and the grading impact were reported to the Air Force Headquarters several times by Tinker AFB.

■ In any event, these additional points raised on behalf of the plaintiffs at the trial concerning alleged deficiencies in the reclassification and conversion procedure at Tinker AFB are immaterial insofar as the outcome of the case is concerned. Such deficiencies as may have been chargeable to the officials at Tinker AFB did not result in any diminution in the plaintiffs' annual pay when the pay adjustments were made. At most, any shortcuts in procedure taken by the administrative officials, thus speeding up the pay adjustments for the plaintiffs'

divisions as compared with the pay adjustments for the Industrial Products Division, merely deprived the plaintiffs of the opportunity to receive pay raises as Wage Grade employees *if* the 1975 wage rate survey resulted in a pay raise for Wage Grade employees. The loss of a potential for receiving future pay increases is not actionable. *Cf. Garbacz v. United States,* 228 Ct.Cl. 309, 316, 656 F.2d 628, 634 (1981).

In connection with this aspect of the case, it may be noted that the pay adjustments for the Aircraft and Engine Divisions had already been made when the wage rate survey began; and the survey was in progress when the pay adjustments for the Pneudraulics and Automatic Flight Control & Propulsion Instrument Divisions were made. Hence, when the pay adjustments for the four divisions were made, there was no certainty as to whether the wage rate survey would result in a wage rate increase or decrease for Wage Grade employees.

So far as the record shows, it was merely a fortuitous circumstance that although the quality control inspectors in the Industrial Products Division were the first to have their jobs reclassified (on March 26, 1975), they were the last of the quality control inspectors to have their pay adjusted (on March 7, 1976), thus permitting them to receive the benefit of the 22.5 percent pay increase for Wage Grade employees on October 19, 1975; whereas the quality control inspectors in the Aircraft Division were the last to have their jobs reclassified (on April 7, 1975), and were the first of the quality control inspectors to have their pay adjusted (on July 13, 1975). It is not known whether the officials at Tinker AFB were intentionally emulating the Biblical teaching, "So the last will be first, and the first last" (*Matthew* 20:16).

The disappointment of the plaintiffs over the turn of events which prevented them from receiving the same 22.5 percent pay increase that the quality control inspectors in the Industrial Products Division received on and after October 19, 1975, is quite understandable. However, the handling of the reclassification and conversion program for quality control inspectors at Tinker AFB under the directive from the Civil Service Commission was entrusted to the administrative officials at Tinker AFB, and the timing of the various steps in the program was necessarily left to their discretion. In the absence of positive proof—and there is none in the record—that the administrative officials abused their discretion by proceeding in an arbitrary fashion, thereby directly causing a pecuniary loss to the plaintiffs (as distinguished from the loss of a potential for future pay increases), the court cannot grant them relief on the basis of the reclassification and conversion of their jobs.

### Tom L. Clark

The previous discussion concerning claims based on the reclassification and conversion of the quality control inspector jobs at Tinker AFB is applicable to all the plaintiffs in this case, including plaintiff Tom L. Clark.

Plaintiff Tom L. Clark, however, has an additional claim that requires special consideration. It is a claim based upon the circumstance that on and after July 13, 1975, the date when the pay of the quality control inspectors in his division was adjusted, his General Schedule salary did not include, as an element, the environmental differential pay which he had previously received.

As Wage Grade employees before the reclassification and conversion program was completed, the quality control inspectors at Tinker AFB who performed duties of a hazardous nature received an amount representing environmental differential pay, in addition to their basic pay. When the jobs of these quality control inspectors were converted from the Wage Grade system to General Schedule grades and the incidental pay adjustments were made, the environmental differential pay was not at first included in determining their initial salaries in the new General Schedule grades. Later, however, it was decided that if a particular quality control inspector received environmental differential pay on the last workday

of his or her division before the pay adjustments for the division were made as an incident of the conversion of the jobs to General Schedule grades, the inspector was entitled to have his or her salary in the new General Schedule grade adjusted upward retroactively so as to include the environmental differential pay. The salaries of all the quality control inspectors who performed hazardous duties, other than Tom L. Clark, were retroactively increased.

Plaintiff Tom L. Clark, as a quality control inspector performing hazardous duties, had been receiving environmental pay since 1970. His job was converted from the Wage Grade system to a General Schedule grade, and the incidental pay adjustments for his division were made, on July 13, 1975. Plaintiff Clark did not work on the last workday for his division before July 13, as he was on a 2-week period of annual leave that began on July 1, 1975. While on annual leave, he was entitled to receive his basic pay, but, as he was not actually performing hazardous duties during his vacation, he was not entitled to, and did not, receive environmental differential pay while on vacation, which included the last workday for his division before July 13, 1975.

When the salaries of the other quality control inspectors performing hazardous duties were adjusted upward to include, in their General Schedule salaries, amounts equivalent to the environmental differential pay which they had received as Wage Grade employees, plaintiff Tom L. Clark's salary was not similarly adjusted upward.

Thus, of all the quality control inspectors at Tinker AFB who had been performing hazardous duties before the pay adjustments for their particular divisions were made, plaintiff Tom L. Clark is the only one whose General Schedule salary does not reflect this particular element of pay. This is despite the fact that plaintiff Clark, like the other inspectors mentioned, performed hazardous duties when at work, both before and after the pay adjustment date.

The decision to deny this benefit to plaintiff Tom L. Clark merely because he happened to be on vacation, and not at work, on the last workday for his division before the pay adjustment date of July 13, 1975, was unduly technical. It must also be characterized as discriminatory, arbitrary, and unjust.

It is concluded that plaintiff Tom L. Clark is entitled to recover on this aspect of his claim.

### CONCLUSION OF LAW

On the facts as found by the court, and stated in the memorandum of decision, the court concludes as a matter of law that the plaintiffs, other than plaintiff Tom L. Clark, are not entitled to recover.

The complaint will be dismissed as to the plaintiffs other than plaintiff Tom L. Clark.

The court further concludes as a matter of law that plaintiff Tom L. Clark is entitled to recover to the extent stated in the memorandum of decision.

The amount of plaintiff Tom L. Clark's recovery will be determined in subsequent proceedings under Rule 42(c).

IT IS SO ORDERED.