*565 Justice Alito,
with whom The Chief Justice joins, dissenting.
The decree in this case is a perfect example of what the Prison Litigation Reform Act of 1995 (PLRA), 110 Stat. 1321-66, was enacted to prevent.
The Constitution does not give federal judges the authority to run state penal systems. Decisions regarding state prisons have profound public safety and financial implications, and the States are generally free to make these decisions as they choose. See Turner v. Safiey, 482 U. S. 78, 85 (1987).
The Eighth Amendment imposes an important — but limited — restraint on state authority in this field. The Eighth Amendment prohibits prison officials from depriving inmates of “the minimal civilized measure of life’s necessities.” Rhodes v. Chapman, 452 U. S. 337, 347 (1981). Federal courts have the responsibility to ensure that this constitutional standard is met, but undesirable prison conditions that do not violate the Constitution are beyond the federal courts’ reach.
In this case, a three-judge court exceeded its authority under the Constitution and the PLRA. The court ordered a radical reduction in the California prison population without finding that the current population level violates the Constitution.
Two cases were before the three-judge court, and neither targeted the general problem of overcrowding. Indeed, the plaintiffs in one of those cases readily acknowledge that the current population level is not itself unconstitutional. Brief for Coleman Appellees 56. Both of the cases were brought not on behalf of all inmates subjected to overcrowding, but rather in the interests of much more limited classes of prisoners, namely, those needing mental health treatment and those with other serious medical needs. But these cases were used as a springboard to implement a criminal justice program far different from that chosen by the state legisla *566 ture. Instead of crafting a remedy to attack the specific constitutional violations that were found — which related solely to prisoners in the two plaintiff classes — the lower court issued a decree that will at best provide only modest help to those prisoners but that is very likely to have a major and deleterious effect on public safety.
The three-judge court ordered the premature release of approximately J/,6,000 criminals — the equivalent of three Army divisions.
The approach taken by the three-judge court flies in the face of the PLRA. Contrary to the PLRA, the court’s remedy is not narrowly tailored to address proven and ongoing constitutional violations. And the three-judge court violated the PLRA’s critical command that any court contemplating a prisoner release order must give “substantial weight to any adverse impact on public safety.” 18 U. S. C. § 3626(a)(1)(A). The three-judge court would have us believe that the early release of 46,000 inmates will not imperil — and will actually improve — public safety. App. to Juris. Statement, O. T. 2009, No. 09-416, pp. 248a-249a (hereinafter Juris. App.). Common sense and experience counsel greater caution.
I would reverse the decision below for three interrelated reasons. First, the three-judge court improperly refused to consider evidence concerning present conditions in the California prison system. Second, the court erred in holding that no remedy short of a massive prisoner release can bring the California system into compliance with the Eighth Amendment. Third, the court gave inadequate weight to the impact of its decree on public safety.
I
Both the PLRA and general principles concerning injunctive relief dictate that a prisoner release order cannot properly be issued unless the relief is necessary to remedy an ongoing violation. Under the PLRA, a prisoner release may *567 be decreed only if crowding “is the primary cause” of an Eighth Amendment violation and only if no other relief “will remedy” the violation. § 3626(a)(3)(E) (emphasis added). This language makes it clear that proof of past violations alone is insufficient to justify a court-ordered prisoner release.
Similarly, in cases not governed by the PLRA, we have held that an inmate seeking an injunction to prevent a violation of the Eighth Amendment must show that prison officials are “knowingly and unreasonably disregarding an objectively intolerable risk of harm, and that they will continue to do so ... into the future.” Farmer v. Brennan, 511 U. S. 825, 846 (1994). The “deliberate indifference” needed to establish an Eighth Amendment violation must be examined “in light of the prison authorities’ current attitudes and conduct,” Helling v. McKinney, 509 U. S. 25, 36 (1993), which means “their attitudes and conduct at the time suit is brought and persisting thereafter,” Farmer, supra, at 845.
For these reasons, the propriety of the relief ordered here cannot be assessed without ascertaining the nature and scope of any ongoing constitutional violations. Proof of past violations will not do; nor is it sufficient simply to establish that some violations continue. The scope of permissible relief depends on the scope of any continuing violations, and therefore it was essential for the three-judge court to make a reliable determination of the extent of any violations as of the time its release order was issued. Particularly in light of the radical nature of its chosen remedy, nothing less than an up-to-date assessment was tolerable.
The three-judge court, however, relied heavily on outdated information and findings and refused to permit California to introduce new evidence. Despite evidence of improvement,[1] *568 the three-judge court relied on old findings made by the single-judge courts, see Juris. App. 76a-77a, including a finding made 14 years earlier, see id., at 170a (citing Coleman v. Wilson, 912 F. Supp. 1282, 1316, 1319 (ED Cal. 1995)). The three-judge court highlighted death statistics from 2005, see Juris. App. 9a, while ignoring the “significant and continuous decline since 2006,” California Prison Health Care Receivership Corp., K. Imai, Analysis of Year 2008 Death Reviews 31 (Dec. 2009) (hereinafter 2008 Death Reviews). And the court dwelled on conditions at a facility that has since been replaced. See Juris. App. 19a-20a, 24a, 89a-90a, 94a, 107a, 111a.
Prohibiting the State from introducing evidence about conditions as of the date when the prisoner release order was under consideration, id., at 76a-78a, and n. 42, the three-judge court explicitly stated that it would not “evaluate the state’s continuing constitutional violations,” id., at 77a. Instead, it based its remedy on constitutional deficiencies that, in its own words, were found “years ago.” Ibid.[2]
The three-judge court justified its refusal to receive up-to-date evidence on the ground that the State had not filed a motion to terminate prospective relief under a provision of the PLRA, § 3626(b). See Juris. App. 77a. Today’s opinion for this Court endorses that reasoning, ante, at 523-524. But the State’s opportunity to file such a motion did not eliminate the three-judge court’s obligation to ensure that its relief was necessary to remedy ongoing violations.[3] More *569 over, the lower court’s reasoning did not properly take into account the potential significance of the evidence that the State sought to introduce. Even if that evidence did not show that all violations had ceased — the showing needed to obtain the termination of relief under § 3626(b) — that evidence was highly relevant with respect to the nature and scope of permissible relief.[4]
The majority approves the three-judge court’s refusal to receive fresh evidence based largely on the need for “[orderly trial management.” Ibid. The majority reasons that the three-judge court had closed the book on the question of constitutional violations and had turned to the question of remedy. Ibid. As noted, however, the extent of any continuing constitutional violations was highly relevant to the question of remedy.
The majority also countenances the three-judge court’s reliance on dated findings. The majority notes that the lower court considered recent reports by the Special Master and ’Receiver, ante, at 516, but the majority provides no persuasive justification for the lower court’s refusal to receive hard, up-to-date evidence about any continuing violations. *570 With the safety of the people of California in the balance, the record on this issue should not have been closed.
The majority repeats the lower court’s error of reciting statistics that are clearly out of date. The Court notes the lower court’s finding that as of 2005 “ ‘an inmate in one of California’s prisons needlessly dies every six to seven days.’ ” See ante, at 507. Yet by the date of the trial before the three-judge court, the death rate had been trending downward for 10 quarters, App. 2257, and the number of likely preventable deaths fell from 18 in 2006 to 3 in 2007, a decline of 83 percent.[5] Between 2001 and 2007, the California prison system had the 13th lowest average mortality rate of all 50 state systems.[6]
The majority highlights past instances in which particular prisoners received shockingly deficient medical care. See ante, at 503-504, 504-505, 508 (recounting five incidents). But such anecdotal evidence cannot be given undue weight in assessing the current state of the California system. The population of the California prison system (156,000 inmates *571 at the time of trial) is larger than that of many medium-sized cities,[7] and an examination of the medical care provided to the residents of many such cities would likely reveal cases in which grossly deficient treatment was provided. Instances of past mistreatment in the California system are relevant, but prospective relief must be tailored to present and future, not past, conditions.
II
Under the PLRA, a court may not grant any prospective relief unless the court finds that the relief is narrowly drawn, extends no further than necessary to correct the “violation of [a] Federal right, and is the least intrusive means necessary to correct the violation of the Federal right.” § 3626(a)(1)(A). In addition, the PLRA prohibits the issuance of a prisoner release order unless the court finds “by clear and convincing evidence that . . . crowding is the primary cause of the violation of a Federal right” and that “no other relief will remedy the violation of the Federal right.” § 3626(a)(3)(E).
These statutory restrictions largely reflect general stand- ’ ards for injunctive relief aimed at remedying constitutional violations by state and local governments. “The power of the federal courts to restructure the operation of local and state governmental entities is not plenary. ... Once a constitutional violation is found, a federal court is required to tailor the scope of the remedy to fit the nature and extent of the constitutional violation.” Dayton Bd. of Ed. v. Brinkman, 433 U. S. 406, 419-420 (1977) (internal quotation marks omitted).
Here, the majority and the court below maintain that no remedy short of a massive release of prisoners from the general prison population can remedy the State’s failure to pro *572 vide constitutionally adequate health care. This argument is implausible on its face and is not supported by the requisite clear and convincing evidence.
It is instructive to consider the list of deficiencies in the California prison health care system that are highlighted in today’s opinion for this Court and in the opinion of the court below. The deficiencies noted by the majority here include the following: “ ‘[e]xam tables and counter tops, where prisoners with . .. communicable diseases are treated, [are] not routinely disinfected,’ ” ante, at 508; medical facilities “ ‘are in an abysmal state of disrepair,”' ibid.; medications "‘are too often not available when needed,’ ” ibid.; “ ‘[b]asie medical equipment is often not available or used,’ ” ibid.; prisons “would ‘hire any doctor who had “a license, a pulse and a pair of shoes,” ’ ” ibid.; and medical and mental health staff positions have high vacancy rates, ante, at 517. The three-judge court pointed to similar problems. See Juris. App. 93a-121a (citing, among other things, staffing vacancies, too few beds for mentally ill prisoners, and an outmoded records management system).
Is it plausible that none of these deficiencies can be remedied without releasing 46,000 prisoners? Without taking that radical and dangerous step, exam tables and counter-tops cannot properly be disinfected? None of the system’s dilapidated facilities can be repaired? Needed medications and equipment cannot be purchased and used? Staff vacancies cannot be filled? The qualifications of prison physicians cannot be improved? A better records management system cannot be developed and implemented?
I do not dispute that general overcrowding contributes to many of the California system’s health care problems. But it by no means follows that reducing overcrowding is the only or the best or even a particularly good way to alleviate those problems. Indeed, it is apparent that the prisoner release ordered by the court below is poorly suited for this purpose. The release order is not limited to prisoners need *573 ing substantial medical care but instead calls for a reduction in the system’s overall population. Under the order issued by the court below, it is not necessary for a single prisoner in the plaintiff classes to be released. Although some class members will presumably be among those who are discharged, the decrease in the number of prisoners needing mental health treatment or other forms of extensive medical care will be much smaller than the total number of prisoners released, and thus the release will produce at best only a modest improvement in the burden on the medical care system.
The record bears this out. The Special Master stated dramatically that even releasing 100,000 inmates (two-thirds of the California system’s entire inmate population!) would leave the problem of providing mental health treatment “largely unmitigated.” App. 487. Similarly, the Receiver proclaimed that “ ‘those . . . who think that population controls will solve California’s prison health care problems . . . are simply wrong.’ ” Juris. App. 282a.
The State proposed several remedies other than a massive release of prisoners, but the three-judge court, seemingly intent on attacking the broader problem of general overcrowding, rejected all of the State’s proposals. In doing so, the court made three critical errors.
First, the court did not assess those proposals and other remedies in light of conditions proved to exist at the time the release order was framed. Had more recent evidence been taken into account, a less extreme remedy might have been shown to be sufficient.
Second, the court failed to distinguish between conditions that fall below the level that may be desirable as a matter of public policy and conditions that do not meet the minimum level mandated by the Constitution. To take one example, the court criticized the California system because prison doctors must conduct intake exams in areas separated by folding screens rather than in separate rooms, creating conditions *574 that “do not allow for appropriate confidentiality.” Id., at 88a. But the legitimate privacy expectations of inmates are greatly diminished, see Hudson v. Palmer, 468 U. S. 517, 525-526 (1984), and this Court has never suggested that the failure to provide private consultation rooms in prisons amounts to cruel and unusual punishment.
Third, .the court rejected alternatives that would not have provided “ ‘immediate’ ” relief. Juris. App. 148a. But nothing in the PLRA suggests that public safety may be sacrificed in order to implement an immediate remedy rather than a less dangerous one that requires a more extended but reasonable period of time.
If the three-judge court had not made these errors, it is entirely possible that an adequate but less drastic remedial plan could have been crafted. Without up-to-date information, it is not possible to specify what such a plan might provide, and in any event, that is hot a task that should be undertaken in the first instance by this Court. But possible components of such a plan are not hard to identify.
Many of the problems noted above plainly could be addressed without releasing prisoners and without incurring the costs associated with a large-scale prison construction program. Sanitary procedures could be improved; sufficient supplies of medicine and medical equipment could be purchased; an adequate system of records management could be implemented; and the number of medical and other staff positions could be increased. Similarly, it is hard to believe that staffing vacancies cannot be reduced or eliminated and that the qualifications of medical personnel cannot be improved by any means short of a massive prisoner release. Without specific findings backed by hard evidence, this Court should not accept the counterintuitive proposition that these problems cannot be ameliorated by increasing salaries, improving working conditions, and providing better training and monitoring of performance.
*575 While the cost of a large-scale construction program may well exceed California’s current financial capabilities, a more targeted program, involving the repair and perhaps the expansion of current medical facilities (as opposed to general prison facilities), might be manageable. After all, any remedy in this case, including the new programs associated with the prisoner release order and other proposed relief now before the three-judge court, will necessarily involve some state expenditures.
Measures such as these might be combined with targeted reductions in critical components of the State’s prison population. A certain number of prisoners in the classes on whose behalf the two cases were brought might.be transferred to out-of-state facilities. The three-judge court rejected the State’s proposal to transfer prisoners to out-of-state facilities in part because the number of proposed transfers was too small. See id., at 160a. See also ante, at 527. But this reasoning rested on the court’s insistence on a reduction in the State’s general prison population rather than the two plaintiff classes.
When the State proposed to make a targeted transfer of prisoners in one of the plaintiff classes (i e., prisoners needing mental health treatment), one of the District Judges blocked the transfers for fear that the out-of-state facilities would not provide a sufficiently high level of care. See App. 434-440. The District Judge even refused to allow out-of-state transfers for prisoners who volunteered for relocation. See id., at 437. And the court did this even though there was not even an allegation, let alone clear evidence, that the States to which these prisoners would have been sent were violating the Eighth Amendment.
The District Judge presumed that the receiving States might fail to provide constitutionally adequate care, but “ ‘in the absence of clear evidence to the contrary, courts presume that [public officers] have properly discharged their official duties.’” United States v. Armstrong, 517 U. S. 456, 464 *576 (1996) (quoting United States v. Chemical Foundation, Inc., 272 U. S. 1, 14-15 (1926)); Postal Service v. Gregory, 534 U. S. 1, 10 (2001) (“[A] presumption of regularity attaches to the actions of Government agencies”); see also McKune v. Lile, 536 U. S. 24, 51 (2002) (O’Connor, J., concurring in judgment) (“[W]e may assume that the prison is capable of controlling its inmates so that respondent’s personal safety is not jeopardized , at least in the absence of proof to the contrary”).[8]
Finally, as a last resort, a much smaller release of prisoners in the two plaintiff classes could be considered. Plaintiffs proposed not only a systemwide population cap, but also a lower population cap for inmates in specialized programs. Tr. 2915:12-15 (Feb. 3, 2009). The three-judge court rejected this proposal, and its response exemplified what went wrong in this case. One judge complained that this remedy would be deficient because it would protect only the members of the plaintiff classes. The judge stated:
“The only thing is we would be protecting the class members. And maybe that’s the appropriate thing to do. I mean, that’s what this ease is about, but it would be ... difficult for me to say yes, and the hell with everybody else.” Id., at 2915:23-2916:2.
Overstepping his authority, the judge was not content to provide relief for the classes of plaintiffs on whose behalf the suit before him was brought. Nor was he content to remedy the only constitutional violations that were proved — which concerned the treatment of the members of those classes. Instead, the judge saw it as his responsibility to attack the general problem of overcrowding.
*577 III
Before ordering any prisoner release, the PLRA commands a court to “give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief.” §3626(a)(1)(A). This provision unmistakably reflects Congress’ view that prisoner release orders are inherently risky.
In taking this view, Congress was well aware of the impact of previous prisoner release orders. The prisoner release program carried out a few years earlier in Philadelphia is illustrative. In the early 1990’s, federal courts enforced a cap on the number of inmates in the Philadelphia prison system, and thousands of inmates were set free. Although efforts were made to release only those prisoners who were least likely to commit violent crimes, that attempt was spectacularly unsuccessful. During an 18-month period, the Philadelphia police rearrested thousands of these prisoners for committing 9,732 new crimes. Those defendants were charged with 79 murders, 90 rapes, 1,113 assaults, 959 robberies, 701 burglaries, and 2,748 thefts, not to mention thousands of drug offenses.[9] Members of Congress were well aware of this experience.[10]
*578 Despite the record of past prisoner release orders, the three-judge court in this case concluded that loosing 46,000 criminals would not produce a tally like that in Philadelphia and would actually improve public safety. Juris. App. 248a-249a. In reaching this debatable conclusion, the three-judge court relied on the testimony of selected experts, id., at 248a, and the majority now defers to what it characterizes as the lower court’s findings of fact on this controversial public policy issue, ante, at 512-513, 517, 522.
This is a fundamental and dangerous error. When a trial court selects between the competing views of experts on broad empirical questions such as the efficacy of preventing crime through the incapacitation of convicted criminals, the trial court’s choice is very different from a classic finding of fact and is not entitled to the same degree of deference on appeal.
The particular three-judge court convened in this case was “confident" that releasing 46,000 prisoners pursuant to its plan “would in fact benefit public safety.” Juris. App. 248a-249a. According to that court, “overwhelming evidence” supported this purported finding. Id., at 232a. But a more cautious court, less bent on implementing its own criminal justice agenda, would have at least acknowledged that the consequences of this massive prisoner release cannot be ascertained in advance with any degree of certainty and that it is entirely possible that this release will produce results similar to those under prior court-ordered population caps. After all, the sharp increase in the California prison population that the three-judge court lamented, see id., at 254a, has been accompanied by an equally sharp decrease in violent crime.[11] These California trends mirror similar develop *579 ments at the national level,[12] and “[tjhere is a general consensus that the decline in crime is, at least in part, due to more and longer prison sentences.”[13] If increased incarceration in California has led to decreased crime, it is entirely possible that a decrease in imprisonment will have the opposite effect.
Commenting on the testimony of an expert who stated that he could not be certain about the effect of the massive prisoner discharge on public safety, the three-judge court complained that “[sjuch equivocal testimony is not helpful.” Id., at 247a. But testimony pointing out the difficulty of assessing the consequences of this drastic remedy would have been valued by a careful court duly mindful of the overriding need to guard public safety.
The three-judge court acknowledged that it “ha[dj not evaluated the public safety impact of each individual element” of the population reduction plan it ordered the State to implement. App. to Juris. Statement 3a. The majority argues that the three-judge court nevertheless gave substantial weight to public safety because its order left “details of implementation to the State’s discretion.” Ante, at 538. Yet the State had told the three-judge court that, after studying possible population reduction measures, it concluded that “reducing the prison population to 137.5% within *580 a two-year period cannot be accomplished without unacceptably compromising public safety.” Juris. App. 317a. The State found that public safety required a 5-year period in which to achieve the ordered reduction. Ibid.
Thus, the three-judge court approved a population reduction plan that neither it nor the State found could be implemented without unacceptable harm to public safety. And this Court now holds that the three-judge court discharged its obligation to “give substantial weight to any adverse impact on public safety,” § 3626(a)(1)(A), by deferring to officials who did not believe the reduction could be accomplished in a safe manner. I do not believe the PLRA’s public-safety requirement is so trivial.
The members of the three-judge court and the experts on whom they relied may disagree with key elements of the crime-reduction program that the State of California has pursued for the past few decades, including “the shift to inflexible determinate sentencing and the passage of harsh mandatory minimum and three-strikes laws.” Id., at 254a. And experts such as the Receiver are entitled to take the view that the State should “re-thin[k] the place of incarceration in its criminal justice system,” App. 489. But those controversial opinions on matters of criminal justice policy should not be permitted to override the reasonable policy view that is implicit in the PLRA — that prisoner release orders present an inherent risk to the safety of the public.
* * *
The prisoner release ordered in this case is unprecedented, improvident, and contrary to the PLRA. In largely sustaining the decision below, the majority is gambling with the safety of the people of California. Before putting public safety at risk, every reasonable precaution should be taken. The decision below should be reversed, and the case should be remanded for this to be done.
*581 I fear that today’s decision, like prior prisoner release orders, will lead to a grim roster of victims. I hope that I am -wrong.
In a few years, we will see.

 Before requesting the appointment of a three-judge court, the District Court in Coleman recognized “commendable progress” in the State’s effort to provide adequate mental health care, Juris. App. 294a, and the District Court in Plata acknowledged that “the Receiver has made much *568 progress since his appointment,” id., at 280a. The report of the Special Master to which the Court refers, ante, at 516, identifies a “generally positive trend.” App. 803.

 For this reason, it is simply not the case that “evidence of current conditions . . . informed every aspect of the judgment of the three-judge court,” as the majority insists, ante, at 522-523.

 Because the Ninth Circuit places the burden on the State to prove the absence of an ongoing violation when it moves to terminate prospective relief, see Gilmore v. California, 220 F. 3d 987, 1007 (CA9 2000), even if the State had unsuccessfully moved to terminate prospective relief under *569 18 U. S. C. § 3626(b), there would still have been no determination that plaintiffs had carried their burden under the PLRA to establish by clear and convincing evidence that a prisoner release order is necessary to correct an ongoing rights violation.

 It is also no answer to say, as the Court now does, ante, at 523-524, that the State had the opportunity to resist the convening of the three-judge court on the ground that there were no unremedied constitutional violations as of that date. See § 3626(a)(3)(A)(i). The District Courts granted plaintiffs’ motions to convene a three-judge court in 2007, three years before the remedial decree here was issued. Thus, the conditions in the prison system as of the date when the decree was issued were not necessarily the same as those that existed before the three-judge court proceedings began. Moreover, as noted above, even if all of the violations in the system had not been cured at the time of the remedial decree, an accurate assessment of conditions as of that date was essential in order to ensure that the relief did not sweep more broadly than necessary.

 2008 Death Reviews 22. The majority elides the improvement by combining likely preventable deaths with those that were “possibly preventable,” ante, at 505, n. 4, that is, cases in which “[i]n the judgment of the reviewer,” 2008 Death Reviews 8, “it’s fifty-fifty that better care would have possibly prevented the death,” App. 2277; id., at 2256. As the majority acknowledges, even this class of cases is now dramatically diminished, and the three-judge court must take the current conditions into account when revising its remedy going forward. Ante, at 505, n. 4.

 Dept. of Justice, Bureau of Justice Statistics, State Prison Deaths, 2001-2007 (Table 13), online at http://bjs.ojp.usdoj.gov/index.cfm?ty= pbdetail&iid=2093 (all Internet materials as visited May 20, 2011, and available in Clerk of Court’s case file); see also App. 2257-2258. California had the 14th lowest ‘“average annual illness mortality [rate] per 100,000 state prisoners from 2001 to 2004.’” Juris. App. 125a. According to a 2007 report, state prisoners had a 19 percent lower death rate than the general U. S. adult population as of 2004. Dept, of Justice, Bureau of Justice Statistics, G. Mumola, Medical Causes of Death in State Prisons, 2001-2004, p. 1, online at http://bjs.ojp.usdoj.gov/content/pub/pdf/mcdsp04.pdf.

 For example, the population of the California prison system exceeds that of Syracuse, New York; Bridgeport, Connecticut; Springfield, Massachusetts; Eugene, Oregon; and Savannah, Georgia.

 The Court rejects the State’s argument that out-of-state transfers offer a less restrictive alternative to a prisoner release order because “requiring out-of-state transfers itself qualifies as a population limit under the PLRA.” Ante, at 527. But the PLRA does not apply when the State voluntarily conducts such transfers, as it has sought to do.

 Hearing on Prison Reform before the Senate Committee on the Judiciary, 104th Cong., 1st Sess., 49 (1995) (statement of Lynne Abraham, District Attorney of Philadelphia); Hearings before the Subcommittee on Crime of the House Committee on the Judiciary, 104th Cong., 1st Sess., 259 (1995) (same); see also Hearing before the Subcommittee on Crime, Terrorism, and Homeland Security of the House Committee on the Judiciary, 110th Cong., 2d Sess., 31 (2008) (statement of Sarah V. Hart, Assistant District Attorney, Philadelphia District Attorney’s Office).

 Condemning the inappropriate imposition of prison population caps, Senator Dole cited “the case of Philadelphia, where a court-ordered prison cap has put thousands of violent criminals back on the city’s streets, often with disastrous consequences.” 141 Cong. Ree. 26549 (1995). Senator Abraham complained that “American citizens are put at risk every day by court decrees . . . that cure prison crowding by declaring that we must free dangerous criminals before they have served their time.” Id., *578 at 26448. “The most egregious example,” he added, “is the city of Philadelphia.” Ibid.

 From 1992 to 2009, the violent crime rate in California per 100,000 residents fell from 1,119.7 to 472 — a decrease of 57.8 percent. Similarly, *579 in the United States from 1992 to 2009, the violent crime rate per 100,000 residents fell from 757.7 to 429.4 — a decrease of 43.3 percent. Dept, of Justice, Federal Bureau of Investigation, Uniform Crime Reporting Statistics, http://www.ucrdatatool.gov.

 According to the three-judge court, California’s prison population has increased by 750 percent since the mid-1970’s. Juris. App. 254a. From 1970 to 2005, the Nation’s prison population increased by 700 percent. Public Safety, Public Spending: Forecasting America’s Prison Population 2007-2011,19 Fed. Sentencing Rep. 234 (2007).

 Paternoster, How Much-Do We Really Know About Criminal Deterrence? 100 J. Crim. L. & C. 765, 801 (2010) (citing research on this issue).